UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KERVING'S GUILLAUME,                   :

    Petitioner,                    :

                            :

v.                                     :        CASE NO. 3:02CV1276 (RNC)

JOHN ASHCROFT, Attorney General        :
of the United States, et al.,          :

    Respondents.                   :        December 15, 2003


**BRIEF OF *AMICUS CURIAE***
**ALLARD K. LOWENSTEIN INTERNATIONAL HUMAN RIGHTS CLINIC**
**AT YALE LAW SCHOOL**

**SUBMITTED AT THE REQUEST OF THE COURT**

Mary J. Hahn
James J. Silk
Allard K. Lowenstein International
    Human Rights Clinic
Yale Law School
127 Wall Street
New Haven, Connecticut 06511
Telephone: (203) 432-8368
Facsimile: (203) 432-8260

*On the Brief*:
Candace R. Jackson
Peter Y. Lee
Robert A. Parker

*Of Counsel*:
J.L. Pottenger, Jr.
Nathan Baker Clinical Professor of Law
Yale Law School

## **QUESTIONS PRESENTED**

1. To what extent does the definition of torture in Article 1 of the Convention Against Torture encompass omissions as well as affirmative acts?

2. What level of intent is required under the definition of torture in Article 1 of the Convention Against Torture, and how does U.S. law incorporate this standard?

3. Does the definition of torture in Article 1 of the Convention Against Torture encompass purposes other than those explicitly listed in that article, and do warning and deterrence satisfy the purpose requirement of the Convention Against Torture?

4. To what extent may a state avoid violating the Convention Against Torture by invoking the "lawful sanctions" exception found in Article 1?

# TABLE OF CONTENTS

QUESTIONS PRESENTED ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... iv

STATEMENT OF INTEREST ........................................................................................... vii

INTRODUCTION ................................................................................................................. 1

   Statement of Facts .......................................................................................................... 1

   The Convention Against Torture ................................................................................... 3

   Sources of International Law .......................................................................................... 5

   Summary of Argument ................................................................................................... 5

ARGUMENT ......................................................................................................................... 8

I.    UNDER THE CONVENTION AGAINST TORTURE, OMISSIONS SUCH AS THE
     FAILURE TO PROVIDE ADEQUATE FOOD, WATER, AND MEDICINE CAN
     CONSTITUTE ACTS OF TORTURE. ............................................................................ 8

II.   UNDER DOMESTIC AND INTERNATIONAL LAW, A FINDING OF TORTURE
     REQUIRES THAT AN ACT BE DELIBERATE, NOT ACCIDENTAL, AND THAT IT
     FORESEEABLY RESULT IN SEVERE MENTAL OR PHYSICAL PAIN OR
     SUFFERING. .................................................................................................................... 9

    A.   As applied and interpreted in international law, Article 1 of the CAT does not require
       that the perpetrator of an act of torture have the subjective desire to cause severe
       mental or physical pain or suffering. .......................................................................... 11

    B.   The phrase "specifically intended" in the Senate Resolution ratifying the CAT and in
       8 C.F.R. § 208.18(a)(5) does not graft a specific intent requirement onto the CAT's
       definition of torture, as applied in U.S. law. ............................................................. 16

III.  A PRACTICE OF DETENTION DESIGNED TO WARN CRIMINAL DEPORTEES
     AND TO DETER CRIME SATISFIES THE CAT'S PURPOSE REQUIREMENT. ...... 23

    A.   A state practice designed to warn and deter is tantamount to intimidation and
       punishment and, when applied to one category of people, may have a discriminatory
       purpose, and thus has purposes expressly identified in the CAT. ............................... 24

    B.   Acts may constitute torture even if the purposes of those acts are legitimate. ............ 28

C.   When determining whether an act constitutes torture, purposes other than those expressly listed in the CAT may satisfy the CAT's purpose requirement.................... 29

IV.  THE "LAWFUL SANCTIONS" EXCEPTION MUST BE STRICTLY CONSTRUED IN ORDER TO PREVENT STATES FROM CIRCUMVENTING THE CAT'S PROHIBITION OF TORTURE. .................................................................................. 32

A.   A government practice cannot qualify as a lawful sanction if it defeats the object and purpose of the CAT to prohibit torture. ...................................................... 32

B.   A government practice must comport with international law in order to qualify as a lawful sanction. ............................................................................................................... 34

C.   Under the CAT, review of government practices must consider both the policies served and methods used to achieve those policies, and even the most compelling policy goal cannot provide sufficient justification for employing torture. ...................................... 36

CONCLUSION................................................................................................................................ 38

# TABLE OF AUTHORITIES

## *CASES*

*Builes v. Nye*, 239 F.Supp.2d 518 (M.D.Pa. 2003) ........................................................ 22

*Carry v. Holmes*, No. 02-CV-0369Sr, slip op. (W.D.N.Y. July 18, 2003) (Report, Recommendation, and Order) ....................................................................... 17, 27, 32

Case 10.832, Inter-Am. C.H.R., OEA/Ser.L/V/II.98 (1998), *available at* http://www.cidh.oas.org/ annualrep/97eng/Dom.Rep.10832.htm ...................................... 14, 30

H.C. 5100/94, *Pub. Comm. Against Torture in Israel v. Israel* (1999) .................................. 36, 37

*Matter of Guillaume*, slip op. (BIA Apr. 11, 2002) ..................................................... 26

*Matter of J-E-*, 23 I&N Dec. 291 (BIA 2002) ....................................................... passim

*Ontunez-Tursios v. Ashcroft*, 303 F.3d 341 (5th Cir. 2002) .............................................. 22

*Prosecutor v. Akayesu*, ICTR-96-4-T (Trial Chamber I Sept. 2, 1998), *aff'd* (ICTR Appeals Chamber, June 1, 2001) ........................................................................ 26, 29, 31

*Prosecutor v. Delalic*, IT-96-21-T (ICTY Trial Chamber Nov. 16, 1998).................. 9, 11, 15, 18

*Prosecutor v. Furundžija*, IT-95-17/1-T (ICTY Trial Chamber Dec. 10, 1998), *aff'd* (ICTY Appeals Chamber July 21, 2000).......................................................... 11, 31

*Prosecutor v. Kunarac*, IT-96-23 (ICTY Appeals Chamber June 12, 2002) ................... 11, 12, 25

*Prosecutor v. Kunarac*, IT-96-23-T (ICTY Trial Chamber Feb. 22, 2001) ...................... 9, 11, 26

*Suresh v. Canada*, [2002] 1 S.C.R. 3 ............................................................. 37

*United States v. Francis*, 164 F.3d 120 (2d Cir. 1999)................................................. 12

*Zubeda v. Ashcroft*, 333 F.3d 463 (3d Cir. 2003) ............................................... 17, 18, 21

## *STATUTES, REGULATIONS, AND LEGISLATIVE HISTORY*

2 U.S.C. § 658b(d)(3) (2000) (Organization of Congressional Committees)................................ 19

5 U.S.C. 8902a(a)(1)(D) (2000) (Debarment) ....................................................... 20

10 U.S.C. § 880(a) (2000) (Uniform Code of Military Justice – Attempts)................................. 20

15 U.S.C. § 6604(b)(3) (2000) (Punitive Damages in Y2K Actions)........................................... 20

15 U.S.C. § 6605 (c)(2)(B) (2000) (Recklessness in Y2K Non-Contract Actions)..................... 20

15 U.S.C. § 6605(b)(1) (2000) (Proportionate Liability in Y2K Non-Contract Actions) ........... 20

18 U.S.C. § 1091(a) (Genocide) (2000)..................................................................................... 20

18 U.S.C. § 2340(1) (Torture) (2000)........................................................................................ 19

19 U.S.C. § 1675(d)(1) (2000) (Administrative Review of Antidumping Determinations)......... 19

20 U.S.C. § 1232g(a)(1)(C)(ii) (2000) (Family Educational Privacy Rights) ............................. 19

20 U.S.C. § 1232g(a)(1)(D) (2000) (Family Educational Privacy Rights)................................... 19

31 U.S.C. § 3729(b) (2000) (False Claims) ................................................................................ 20

Foreign Affairs Reform and Restructuring Act, Pub. L. 105-277, Div. G, Subdiv. B, Title XXII
    (Oct. 21, 1998) ................................................................................................... 4, 16, 21

Implementation of the Convention Against Torture, 8 C.F.R. § 208.18 (2003).................... passim

Report of the Senate Committee on Foreign Relations, S. Exec. Rep. No. 101-30 (1990)
    .......................................................................................................... 18, 21, 22, 33

*Restatement (Third) of the Foreign Relations Law of the United States* (1987) ............... 5, 21, 33

Senate Resolution of Ratification, 101st Cong., 2d Sess., 136 Cong. Rec. S17486 (daily ed., Oct.
    27, 1990.....................................................................................................passim

## TREATIES AND CONVENTIONS

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,
    *opened for signature* Dec. 10, 1984, G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, at
    197, U.N. Doc. A/RES/39/708 (1984), *entry into force* June 26, 1987 ............................ passim

Inter-American Convention to Prevent and Punish Torture, *opened for signature* Dec. 9, 1985,
    OAS Treaty Ser., No. 67, *entry in force* Feb 28, 1987 .......................................... 13, 14, 30, 31

Vienna Convention on the Law of Treaties, *opened for signature* May 23, 1969, 1155 U.N.T.S.
    331 (1969), *entry into force* Jan. 27, 1980.................................................... 21, 32, 33

## UNITED NATIONS REPORTS

Comm. Against Torture, Communication No. 57/1996: Canada, Nov. 17, 1997, U.N. Doc. CAT/C/19/D/57/1996, *available at* http://www.unhchr.ch/tbs/doc.nsf/385c2 add1632f4a8c12565a9004dc311/ 9f518ac7f91311dd802566f2003fda8e?OpenDocument..... 35

Comm. Against Torture, Summary Record of the 334th Meeting: Kuwait, New Zealand, Oct. 19, 1998, U.N. Doc. CAT/C/SR.334, *available at* http://www.unhchr.ch/tbs/ doc.nsf/385c2 add1632 f4a8c12565a9004dc311/30f173e334d03ba1802566a5003d7229?OpenDocument .. 35

Report of the Special Rapporteur, Mr. Nigel S. Rodley, Submitted Pursuant to Commission on Human Rights Resolution 1995/37 B, Jan. 10, 1997, U.N. Doc. E/CN.4/1997/7, *available at* http://www.hri.ca/fortherecord1997/documentation/commission/e-cn4-1997-7.htm. ............. 35

Report of the Special Rapporteur on Torture and Cruel, Inhuman or Degrading Treatment or Punishment, U.N. Doc. E/CN.4/1995/34 (1995) ...................................................................... 13

## OTHER AUTHORITIES

*Black's Law Dictionary* (7th ed. 1999)................................................................................. 9, 26

Chris Ingelse, *The UN Committee against Torture* 213 (2001)....................................................... 33

Dep't of State, *Haiti: Country Reports on Human Rights Practices, 2000* (2001), *in* Ex. in Support of Respondent's Application for Relief under the CAT ...................................... 2, 3, 26

J. Herman Burgers & Hans Danelius, *The United Nations Convention against Torture: A Handbook on the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* 118 (1988) ............................................................................. passim

Nigel S. Rodley, *The Treatment of Prisoners Under International Law* 292-93 (2d ed. 1999) ................................................................................................................... 12, 13, 26

Statement of Michelle Karshan, Exec. Dir. of Alternative Chance: Advocacy for Criminal Deportees in Haiti (Aug. 30, 2000), *in* Ex. in Support of Respondent's Application for Relief under the CAT.............................................................................................................. 2, 28

Yves Colon, *Haiti's Prisons: Inside the Gates of Hell*, Miami Herald, Mar. 25, 2001, *in* Ex. in Support of Respondent's Application for Relief under the CAT ................................................ 2

## STATEMENT OF INTEREST

The Allard K. Lowenstein International Human Rights Clinic ("the Clinic") is a Yale Law School program that gives students first-hand experience in human rights legal practice. The Clinic undertakes numerous litigation and research projects on behalf of non-governmental organizations, victims of human rights abuse, and U.S. and international courts and tribunals. The Clinic has done work in numerous and varied fields of international human rights law, including the prohibition against torture and cruel, inhuman or degrading treatment. The Clinic has conducted research and provided briefs for the African Commission on Human and Peoples' Rights, the Inter-American Commission on Human Rights, the South African Truth and Reconciliation Commission, the Special Court for Sierra Leone, and many courts in the United States.

# INTRODUCTION

## STATEMENT OF FACTS

Petitioner Kerving's Guillaume, age 27, is a Haitian citizen who has been a lawful permanent resident of the United States since the age of 14. Having completed a prison sentence for committing an aggravated felony, he now faces removal.

Petitioner has submitted a petition for writ of habeas corpus to this Court to avoid removal to Haiti. He seeks relief under Article 3 of the Convention Against Torture ("CAT"), which prohibits the United States from returning individuals to countries where they would likely be subject to torture.[1] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984), *entry into force* June 26, 1987. Petitioner alleges that, if deported, the Haitian government will imprison him indefinitely in deplorable conditions and that such imprisonment would constitute torture under the CAT. An immigration judge denied Petitioner's request for withholding of deportation. Subsequently, the Board of Immigration Appeals ("BIA") dismissed Petitioner's appeal based on its decision in *Matter of J-E-*, 23 I&N Dec. 291 (BIA 2002). In *Matter of J-E-*, the BIA held that Haiti's detention policy did not amount to torture.[2]

The Haitian government has an unwritten policy of detaining criminal deportees—even those like Petitioner who have completed criminal sentences abroad—and provides no timetable

---

[1] This Brief does not discuss the standard of review this Court should apply to the BIA's decision in this case.

[2] Specifically, the BIA held that the respondent in *Matter of J-E-* did not establish that the Haitian government "deliberately inflicted acts of torture," as required by the CAT. *Matter of J-E-*, 23 I&N Dec. at 303. The BIA also held that, although "isolated acts of torture" do occur inside Haitian prisons, the respondent did not demonstrate that *he* more likely than not would be tortured, rather than severely mistreated. *Id.* at 303-04. Six of the nineteen members on the panel dissented. These members concluded that (1) the totality of conditions in Haitian prisons did constitute torture, (2) the respondent did establish he would more likely than not be tortured upon return to Haiti, and (3) the majority misread specific intent into the CAT's definition of torture. *Id.* at 309-10, 315-16.

for a detainee's release. *See id.* at 299-300; *see also* Dep't of State, *Haiti: Country Reports on Human Rights Practices, 2000* (2001) ("State Dep't Report"), *in* Ex. in Support of Respondent's Application for Relief under the CAT at 4 ("Resp't Ex."). The stated purpose of this indefinite detention is to provide a "warning and deterrent" to criminal deportees to dissuade them from committing crimes in Haiti. *Matter of J-E-*, 23 I&N Dec. at 300; *see* State Dep't Report (Resp't Ex. at 4). The U.S. government does not contest these findings; indeed, the United States has condemned Haiti's detention practices. *Matter of J-E-*, 23 I&N Dec. at 299-300.

The record contains human rights reports and news articles that document abusive and substandard conditions in Haitian detention facilities. These include the following conditions. Detention facilities are inadequate and unsanitary. The cells are at least one-hundred percent beyond capacity and lack toilets, sinks, bedding, ventilation, and light. Detainees relieve themselves in bags and buckets that remain inside the cell. They sleep on cement floors that are flooded during the hurricane season. Detainees clean their insect-infested cells without cleaning supplies and cannot properly dry their wet clothes in the dank environment, a problem that often leads to infection and infestation of lice or maggots. Malnutrition is common. Detainees who do not have family to bring them food from outside must rely on donations from fellow inmates or prison officials to avoid hunger. All detainees drink contaminated tap water they cannot boil. Detainees have no access to medical care or to refrigeration for medicine. *See, e.g.*, State Dep't Report (Resp't Ex. at 4); Yves Colon, *Haiti's Prisons: Inside the Gates of Hell*, Miami Herald, Mar. 25, 2001 (Resp't Ex. at 12-18); Statement of Michelle Karshan, Exec. Dir. of Alternative Chance: Advocacy for Criminal Deportees in Haiti (Aug. 30, 2000) (Resp't Ex. at 19-25). Finally, police and prison officials mistreat detainees by beating, burning, and choking them; these beatings have been described as "'pervasive in all parts of the country.'" *Matter of J-E-*,

23 I&N Dec. at 301-02 (*quoting* State Dep't Report (Resp't Ex. at 3)). The government rarely prosecutes officials guilty of abuse. Detainees often do not report abuse because they fear retribution and believe their complaints will go unheard. State Dep't Report (Resp't Ex. at 4).

The Haitian government is aware of these conditions. The BIA found that "Haitian authorities are intentionally detaining criminal deportees knowing that the detention facilities are substandard," *Matter of J-E-*, 23 I&N Dec. at 301, a finding Respondent in the instant case does not contest. The Haitian government states that it would like to improve conditions in its detention facilities, but lacks the money to do so. *Id.*

## THE CONVENTION AGAINST TORTURE

Article 1 of the CAT defines torture as follows:

1. For the purposes of this Convention, torture means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

2. This article is without prejudice to any international instrument or national legislation which does or may contain provisions of wider application.

Article 3 obligates States Parties not to expel persons to states where they would likely be subjected to torture:

1. No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where

applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

The United States signed the CAT on April 18, 1988, the Senate gave its advice and consent on October 27, 1990, *see* Senate Resolution of Ratification, 101st Cong., 2d Sess., 136 Cong. Rec. S17486 (daily ed., Oct. 27, 1990) ("Senate Resolution"), and the United States submitted its ratification on October 21, 1994. The CAT was codified in U.S. law in the Foreign Affairs Reform and Restructuring Act, Pub. L. 105-277, Div. G, Subdiv. B, Title XXII (Oct. 21, 1998) ("FARRA"), which states that "[e]xcept as otherwise provided, the terms used in this section have the meanings given those terms in the Convention [Against Torture], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." FARRA § 2242(f)(2).

The Senate Resolution and Department of Justice implementing regulations, *see* Implementation of the Convention Against Torture, 8 C.F.R. § 208.18 (2003), include four reservations and understandings that are particularly relevant for present purposes. First, "in order to constitute torture, an act must be *specifically intended* to inflict severe physical or mental pain or suffering . . . ." Senate Resolution § II(1)(a); 8 C.F.R. § 208.18(a)(5) (emphasis added). Second, "the term 'acquiescence' [in Article 1 of the CAT] requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his legal responsibility to intervene to prevent such activity." Senate Resolution § II(1)(d); 8 C.F.R. § 208.18(a)(7). Third, a State Party to the CAT cannot use the "lawful sanctions" exception in Article 1 of the CAT to "defeat the object and purpose of the Convention to prohibit torture." 8 C.F.R. § 208.18(a)(3). Finally, the "substantial grounds" requirement of Article 3 means that an individual cannot be expelled to another state "if it is more likely than not that he would be tortured." Senate Resolution § II(2).

## SOURCES OF INTERNATIONAL LAW

A full understanding of the CAT's meaning requires an examination of international, as well as domestic, law. The CAT is interpreted with reference to several recognized sources of international law, all of which are persuasive in establishing the parameters of the CAT's requirements. These include: (1) the judgments of international tribunals, such as the International Criminal Tribunal for the Former Yugoslavia ("ICTY") and International Criminal Tribunal for Rwanda ("ICTR"); (2) the commentary of the individuals who drafted the CAT and the commentary of the United Nations Special Rapporteur on Torture, who was appointed by the Secretary General of the United Nations to examine and report on torture worldwide; (3) the reports of the United Nations Committee Against Torture, which is the official reporting and commenting body under the CAT, *see* CAT, art. 17; (4) the decisions of supranational bodies, such as the Inter-American Commission on Human Rights, that interpret conventions with requirements similar to those of the CAT; (5) the relevant jurisprudence of respected national courts, especially supreme courts and constitutional courts; (6) leading scholarly writings on the meaning of the CAT; and (7) customary international law, which "results from a general and consistent practice of states followed by them from a sense of legal obligation." *Restatement (Third) of the Foreign Relations Law of the United States* § 102(2) (1987).

## SUMMARY OF ARGUMENT

The act of indefinitely imprisoning an individual in conditions that are known to be grossly substandard, and that foreseeably results in severe mental or physical pain or suffering, for purposes of warning or deterring him from committing crime, is an act of torture prohibited by the CAT. It is immaterial whether the officials responsible for the detention affirmatively create the grossly substandard conditions, affirmatively desire to cause severe pain or suffering,

have a purpose that is illegitimate, illicit, or malevolent, or are authorized to detain individuals under national law.

International law clearly establishes that the distinction between acts and omissions is not relevant in defining torture. The drafters of the CAT and the jurisprudence of the ICTY explicitly state that the word "act" in Article 1 includes omissions—especially deprivations of food, water, and medicine—that may result in severe mental or physical pain or suffering.

The intent with which acts or omissions must be committed to constitute torture is also clear under international law: The language of the CAT, decisions of several international tribunals, and commentary by the drafters of the CAT and the United Nations Special Rapporteur on Torture consistently establish that a finding of torture does not require the perpetrator to have an actual desire to cause severe pain or suffering. Rather, to satisfy the CAT's requirement that an act of torture be "intentionally inflicted," the act need only be deliberate and not accidental, and the pain or suffering need only be a foreseeable consequence of the act. U.S. law is consistent with this definition. Although the Senate Resolution contains, and the implementing regulation applies, an understanding that the CAT requires an act of torture to be "specifically intended," this does not require the particular legal standard of "specific intent" to cause severe mental or physical pain or suffering. Contrary to the BIA's finding in *Matter of J-E-,* the phrase "specifically intended" is not unambiguous. The structural consistency of the Senate Resolution and the presumption against understandings that contravene the object and purpose of the CAT support the conclusion that U.S. law should be interpreted—consistent with international law— not to require specific intent. This conclusion is supported by the leading U.S. case law on the subject.

In order to constitute torture, an act must also be committed for a purpose that falls within the CAT's definition of torture. A policy designed to warn particular individuals and to deter crime meets the purpose requirement of the CAT. Specifically, a policy of imprisoning criminal deportees in grossly substandard prison conditions to warn them and to deter them from committing future crimes has purposes consistent with those listed in the CAT, namely "to intimidate" and "to punish." The same policy, if motivated by discriminatory attitudes toward deportees, may also be consistent with an additional purpose listed in the CAT, "for . . . discrimination of any kind." Furthermore, an act may constitute torture even if its purpose is legitimate—purposes need not be illicit or malevolent to fall within the scope of the CAT. Finally, the list of purposes in the CAT's definition of torture is not exhaustive; purposes related to those listed in Article 1 may satisfy the CAT's purpose requirement. For example, an act that helps to accomplish any purpose related to a state's interests can constitute torture, even where the perpetrator's primary motive is unrelated to such a purpose. Thus, this Court has wide latitude to locate, both within the examples listed in the CAT and the larger categories of "purpose" that the CAT's list illustrates, a purpose or purposes underlying Haiti's detention policy that are requisite to a finding to torture.

If an act satisfies the requisite elements of torture, it does not constitute a "lawful sanction" under Article 1 of the CAT merely because the state has authorized the act under domestic law. The CAT and U.S. implementing regulations expressly recognize that lawful sanctions are valid only if they do not defeat the CAT's object and purpose. Moreover, in order for a practice to be a lawful sanction, it must comport with international law as well as domestic law. Finally, decisions from the highest courts of several States Parties to the CAT reveal that the categorical prohibition of torture trumps even the most vital national interests, leaving no

room for a state to claim public policy justifications for torturous acts or omissions. Thus, asserting the detention of criminal detainees is lawful under national law or that detention serves the legitimate public policy of preventing crime is no defense to a claim of torture.

## ARGUMENT

**I.  UNDER THE CONVENTION AGAINST TORTURE, OMISSIONS SUCH AS THE FAILURE TO PROVIDE ADEQUATE FOOD, WATER, AND MEDICINE CAN CONSTITUTE ACTS OF TORTURE.**

The CAT's definition of torture does not distinguish acts from omissions. Article 1 of the CAT defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted" for a purpose that is deemed to be encompassed by the CAT (hereinafter "a requisite purpose"). Infliction of severe pain or suffering can result from affirmative acts or omissions; a finding of torture under the CAT cannot be overcome on the basis of a theory that omissions do not constitute torture.

In their leading commentary on the CAT, two members of the United Nations working group that drafted the CAT explain:

> Normally, what constitutes torture is a positive act, and the definition in article 1 only refers to acts and not to omissions. This does not exclude, however, that in special cases an omission should be assimilated to an act. The intentional failure to provide a prisoner with food or drink could be a case in point.

J. Herman Burgers & Hans Danelius, *The United Nations Convention against Torture: A Handbook on the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* 118 (1988). The recognition that omissions can give rise to torture has grown stronger through application and interpretation. The ICTY has held that certain elements of the CAT's definition of torture are "uncontentious and are accepted as representing the status of customary international law on the subject: (i) Torture consists of the infliction, by act or

8

omission, of severe pain or suffering, whether physical or mental . . . ." *Prosecutor v. Kunarac*, IT-96-23-T, at para. 483 (ICTY Trial Chamber Feb. 22, 2001), *aff'd* (ICTY Appeals Chamber June 12, 2002).

Specific examples of prohibited practices further illustrate that omissions can constitute torture. The ICTY has noted that the United Nations Special Rapporteur on Torture has found that "acts which involve the infliction of suffering severe enough to constitute the offence of torture [include] prolonged denial of rest or sleep; prolonged denial of food; prolonged denial of sufficient hygiene; [and] prolonged denial of medical assistance," *Prosecutor v. Delalic*, IT-96-21-T, at para. 467 (ICTY Trial Chamber Nov. 16, 1998), and thus "omissions may also provide the requisite material element" necessary for a finding of torture. *Id.* at para. 468. Again, the ICTY found that omissions of basic life necessities may be "acts" of torture if they result in the requisite level of suffering.

The record indicates well-documented and pervasive deprivations of food, water, hygiene, medical care, and other basic life necessities in Haitian detention facilities. Omissions such as these are capable of resulting in severe mental or physical pain or suffering and, thus, may properly be deemed "acts" within the definition of torture.

II.  **UNDER DOMESTIC AND INTERNATIONAL LAW, A FINDING OF TORTURE REQUIRES THAT AN ACT BE DELIBERATE, NOT ACCIDENTAL, AND THAT IT FORESEEABLY RESULT IN SEVERE MENTAL OR PHYSICAL PAIN OR SUFFERING.**

In *Matter of J-E-*, the BIA held that an act of torture, as defined in Article 1 of the CAT, the Senate Resolution, and the implementing regulations, must be committed with specific intent "'to accomplish the precise criminal act that one is later charged with . . . .'" 23 I&N Dec. at 301 (quoting *Black's Law Dictionary* 814 (7th ed. 1999)); *see id.* (stating that in the definition of

torture, "it [is] clear that [there] is a 'specific intent' requirement, not a 'general intent' requirement"). The BIA expressly recognized that "Haitian authorities are *intentionally* detaining criminal deportees knowing that the detention facilities are substandard," *id.* (emphasis added), and that they are doing so "'as a warning and deterrent.'" *Id.* at 300 (quoting Letter from William E. Dilday, Director of the Office of Country Reports and Asylum Affairs, U.S. Dep't of State, to Immigration Judge (Apr. 12, 2001)). Yet the BIA nonetheless held that because Haiti had not "intentionally and deliberately creat[ed] and maintain[ed] such prison conditions in order to inflict torture," Haiti's acts and omissions did not constitute torture under the CAT. *Id.* at 301. This standard appears to impose a requirement of subjective motivation on every element of torture—that is, a requirement that the acting party actually desire to cause severe mental or physical pain or suffering and be motivated by an illicit or malicious purpose. *See id.* at 300-01 (emphasizing that Haiti's attempts to improve conditions are inconsistent with bad faith).

The BIA's standard is incorrect. It finds no support in the text of the CAT or sources of international law applying and interpreting the CAT. Neither the ambiguous use of the phrase "specifically intended" in the Senate Resolution and the implementing regulations nor the single reference to "specific intent" in the legislative history of the Senate Resolution alter the clear consensus under international law: A finding of intent under the CAT requires only that the act be deliberate and the pain or suffering foreseeable. Indeed, U.S. courts that have applied and interpreted the Senate Resolution and implementing regulations have expressly rejected a specific intent standard; the BIA stands alone in its imposition of such a requirement.

A.    **As applied and interpreted in international law, Article 1 of the CAT does not require that the perpetrator of an act of torture have the subjective desire to cause severe mental or physical pain or suffering.**

Under Article 1 of the CAT, "torture means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted" for a requisite purpose. *See infra* Section III (discussing purposes). The text of the CAT neither expressly defines the level of intent required nor specifies which elements of torture must be intended. International law, however, has expressly rejected the definition of intent endorsed by the BIA and makes clear that the phrase "intentionally inflicted" requires: (1) that an act be deliberate, not accidental; and (2) that severe mental or physical pain or suffering be a foreseeable consequence of the act.[3]

An "intentional" act under the CAT is one "which, judged objectively, is deliberate and not accidental." *Delalic*, IT-96-21-T (Trial Chamber) at para. 468; *see* Burgers & Danelius at 118. Although severe pain or suffering resulting from a deliberate act will not support a finding of torture if the pain or suffering is merely accidental, *see* Burgers & Danelius at 118, the lack of a subjective desire or motivation to cause pain or suffering is no defense under the CAT.

The ICTY specifically rejected such a defense in the appeal of Bosnian Serb paramilitary soldiers convicted of torturing Bosnian Muslim women by raping them. *Prosecutor v. Kunarac*, IT-96-23, at para. 153 (ICTY Appeals Chamber June 12, 2002). *See Kunarac*, IT-96-23-T (Trial Chamber) at para. 483 (adopting the CAT's intentionality requirement); *Prosecutor v. Furundžija*, IT-95-17/1-T, at para. 162 (ICTY Trial Chamber Dec. 10, 1998), *aff'd* (ICTY Appeals Chamber July 21, 2000) (same). The appellants claimed that they raped their victims for sexual gratification only and that "[their] intention . . . was of a sexual nature [and thus]

---

[3] In order to find a violation of the CAT, the act must also be intended to achieve a purpose. There is no dispute that Haitian authorities have expressly stated that the intended purposes of this detention policy are to warn and to deter further criminal activity. The legal standards governing the scope of the purpose requirement of the CAT will be discussed in Section III *infra*.

inconsistent with an intent to commit the crime of torture." *Kunarac*, IT-96-23 (Appeals Chamber) at para. 153. The Tribunal held that there was an "important distinction between 'intent' and 'motivation'" and "even if the perpetrator's motivation is entirely sexual, . . . it is important to establish whether [the] perpetrator *intended to act in a way which, in the normal course of events, would cause severe pain or suffering, whether physical or mental, to his victims*." *Id.* (emphasis added). The Tribunal found that the soldiers' act of rape was torture: Even though the soldiers may not have been motivated by a desire to inflict severe pain or suffering on their victims, their acts of rape were deliberate, and severe mental or physical pain or suffering should have been foreseen as arising "in the normal course of events." *Id.*

Notably, the ICTY's definition of the level of intent required by the CAT—that severe mental or physical pain or suffering need only be foreseeable rather than intended and desired— is strikingly similar to the American definition of general intent, not specific intent as required by the BIA. *See, e.g., United States v. Francis*, 164 F.3d 120, 121 (2d Cir. 1999) ("In the case of general-intent crimes, the government need prove only that the defendant intended to do the act in question and intended the reasonable and probable consequences of that act . . . . The government would not need to prove that the defendant intended to violate the law or to bring about some specific result [as with a specific-intent crime].").

The United Nations Special Rapporteur on Torture has likewise found that intentional acts that foreseeably result in severe mental or physical pain or suffering may constitute torture. This is particularly true of poor prison conditions similar to those alleged by Petitioner. In his report on Russian prisons, for example, Special Rapporteur Sir Nigel S. Rodley noted that detention in poor prison conditions, if the detention is committed in furtherance of a requisite purpose, can constitute torture. He reported:

When the door to . . . a general cell is opened, one is hit by a blast of hot, dank, stinking (sweat, urine, feces) gas that passes for air. These general cells may have one filthy sink and a tap, from which water does not always emerge, near a ground-level toilet . . . . There is virtually no daylight from covered or barred windows, through which only a small amount of fresh air can penetrate. Artificial light is weak and not always functioning.

Due to the overcrowding in the general cells . . . there is insufficient room for everyone to lie down, sit down or even stand up at the same time. . . . The inmates tend to be half-clothed and are even stripped to their undershorts . . . . Their bodies are perspiring and nothing can dry due to the humidity. . . . [T]he general cells . . . are disease incubators. Festering sores and boils abound; most if not all inmates suffer from skin diseases that cause pervasive itching.

The detainees . . . are allowed only one hour a day to leave the cell to exercise. Once a week they are able to shower. The food—not always available because of the indebtedness of the institutions—is primitive, of a fat-saturated soupy nature. It is consumed in the cell and is excreted in the cell.

Report of the Special Rapporteur on Torture and Cruel, Inhuman or Degrading Treatment or Punishment, U.N. Doc. E/CN.4/1995/34 (1995), *reprinted in* Nigel S. Rodley, *The Treatment of Prisoners Under International Law* 292-93 (2d ed. 1999). He concluded that if the deliberate act of detention in such conditions was accompanied by "proof of the purposive element required to justify a characterization of torture," then the prisoners could "'properly be described as being subjected to torture.'" *Id.* at 293.[4]

The Inter-American Convention to Prevent and Punish Torture, *opened for signature* Dec. 9, 1985, OAS Treaty Ser., No. 67, *entry in force* Feb. 28, 1987 ("Inter-American Convention") provides in Article 2 that "torture shall be understood to be any act intentionally performed whereby physical or mental pain or suffering is inflicted on a person for purposes of criminal investigation, as a means of intimidation, as personal punishment, as a preventive measure, as a penalty, or for any other purpose." This provision was "influenced by" the

---

[4] The Special Rapporteur specifically referred to purposes listed in the CAT, such as detention in order to elicit information or confessions. As shall be demonstrated in Section III *infra*, however, the list of purposes in the CAT is not exhaustive.

definition of torture in Article 1 of the CAT.  Burgers & Danelius at 117.[5]  Like the CAT, the

Inter-American Convention requires that the act be intentional.  Moreover, the text

unambiguously indicates that the intent requirement relates to the performance of the act, not to

the pain or purpose elements of the definition.  The Inter-American Commission on Human

Rights ("IACHR"), in interpreting the Inter-American Convention, has found that so long as

severe mental or physical pain or suffering foreseeably results, the intentional act of

imprisonment can amount to torture, even without a finding that the perpetrators had the

subjective desire to cause severe mental or physical pain or suffering.

　　　　For example, the IACHR has found that subsequent to a judicial order that a prisoner be

released, continued detention on grounds that the prisoner "represents 'a danger to the country'"

constitutes torture and that solitary confinement of a prisoner for purposes of punishment, when

the prisoner is in a weakened state of health, "seriously endanger[s] [the prisoner's] physical

integrity" and constitutes torture.  Case 10.832, Inter-Am. C.H.R., OEA/Ser.L/V/II.98 (1998), at

paras. 85(a), 86(b), *available at* http://www.cidh.oas.org/annualrep/97eng/Dom.Rep.10832.htm.

The IACHR did not find that prison officials desired to cause the prisoner severe mental or

physical pain or suffering to achieve a requisite purpose.  Yet, the IACHR found that the

deliberate act of imprisoning him for a requisite purpose (under the Inter-American Convention,

any purpose will suffice), where the circumstances of detention would foreseeably cause the

prisoner severe mental or physical pain or suffering (i.e., detaining him for a time beyond that

prescribed by law and aggravating his health problems), nonetheless constituted torture.

　　　　The conclusion that someone can be held responsible for torture even without any actual

desire to cause the victim severe mental or physical pain or suffering is supported by the breadth

---

[5] Differences exist between the two conventions, such as the scope of the purposes that would trigger their
prohibitions, but *amicus curiae* has found nothing to suggest that the intentionality requirements are different.

of the CAT's definition of torture. The inclusion of "acquiescence" in Article 1 provides an example of an act that constitutes torture in the absence of a subjective desire to cause such suffering. As Burgers and Danelius note in their commentary:

> All such situations where the responsibility of the authorities is somehow engaged [in an act of torture] are supposed to be covered by the rather wide phrase appearing in article 1: "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity". If torture is performed by a public agency, . . . *the government of the country has no defence under the [CAT] in saying that it was unaware of the act or even disapproved of it once it was informed.*

Burgers & Danelius at 120 (emphasis added); *see Delalic*, IT-96-21-T (Trial Chamber) at para. 474 ("[Article 1 of the CAT is] stated in very broad terms and extends to officials who take a passive attitude or turn a blind eye to torture, most obviously by failing to prevent or punish torture under national penal or military law, when it occurs."). Willful blindness or passivity is, by definition, deliberate. Yet those who are deliberately blind or deliberately passive need not have any subjective desire to cause pain or suffering. If such pain or suffering is foreseeable (and not merely an accidental byproduct), "acquiescence" may constitute torture under the CAT. The logic underlying the inclusion of acquiescence reinforces the conclusion that the intentionality requirement cannot be read so narrowly as to limit a finding of torture to those who actually desire to cause severe pain or suffering.

As the BIA found, "Haitian authorities are *intentionally* detaining criminal deportees *knowing* that the detention facilities are substandard . . . ." *Matter of J-E-*, 23 I&N Dec. at 301 (emphases added). Haitian officials' deliberate act of detaining prisoners indefinitely in facilities that are severely overcrowded, and in which malnourishment, starvation, disease, lack of basic sanitation and toilet facilities, and other deplorable conditions are widespread, clearly satisfies the CAT's intentionality requirement. Contrary to the BIA's holding, it is not a defense under

15

the CAT for Haitian officials to claim that they did not affirmatively create deplorable prison conditions in order to torture prisoners by deliberately inflicting severe mental or physical pain or suffering. The relevant act is the decision to detain. Where conditions of detention are known to be so harsh that severe pain or suffering is inevitable, the conditions are indivisible from the detention itself, and the deliberate decision to detain criminal deportees necessarily encompasses that pain and suffering.[6] Although the deliberate creation of substandard prison conditions would certainly satisfy the intent requirement, this is not required. As long as government officers deliberately confine prisoners in a facility that the officers know is grossly substandard, and can reasonably foresee that the deplorable conditions in that facility will result in severe mental or physical pain or suffering, the CAT's intent requirement is satisfied.

**B.** **The phrase "specifically intended" in the Senate Resolution ratifying the CAT and in 8 C.F.R. § 208.18(a)(5) does not graft a specific intent requirement onto the CAT's definition of torture, as applied in U.S. law.**

Specific intent to cause severe mental or physical pain or suffering in furtherance of a requisite purpose is not required to satisfy the CAT's definition of torture, and the definition of torture found in U.S. laws implementing the CAT does not add such a requirement. In the statute implementing the CAT, Congress provided that "the terms used in this section have the meanings given those terms in the Convention, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." FARRA § 2242(f)(2). Although the resolution of ratification contains an understanding that "torture . . . must be *specifically intended* to inflict severe physical or mental

---

[6] The following example applies the BIA's holding to extreme circumstances to highlight the holding's logical flaw: *A*, a government agent, wishes to punish *B*. *A* deliberately places *B* in a cell that is infested with poisonous snakes. Although *A* did not place the snakes in the cell, he knows they exist and can foresee that they will cause *B* severe pain and suffering. Under *Matter of J-E-*, *A* would have a perfect defense: He did not deliberately place the snakes in the cell for the purpose of torturing *B*. Fortunately, the CAT does not allow *A* to evade its terms so easily. *A* knows that the snakes exist and deliberately places *B* in a position in which it is foreseen that severe mental or physical pain or suffering will result. This is sufficient to bring *A*'s act within the prohibition of the CAT.

16

pain or suffering," Senate Resolution § II(1)(a) (emphasis added), a requirement restated

verbatim in 8 C.F.R. § 208.18(a)(5), the Third Circuit has held that this understanding does not

require the specific intent to cause pain or suffering. In *Zubeda v. Ashcroft*, 333 F.3d 463 (3d

Cir. 2003), the Third Circuit held:

> Although the regulations require that severe pain or suffering be "intentionally inflicted," we do not interpret this as a "specific intent" requirement. Rather, we conclude that the Convention [Against Torture] simply excludes severe pain or suffering that is the unintended consequence of an intentional act. The regulation does state: "in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." However, the regulation immediately explains: "[a]n act that results in unanticipated or unintended severity of pain and suffering is not torture." *The intent requirement therefore distinguishes between suffering that is the accidental result of an intended act, and suffering that is purposefully inflicted or the foreseeable consequence of deliberate conduct. However, this is not the same as requiring a specific intent to inflict suffering.*

333 F.3d at 473 (emphasis added) (internal citations omitted).[7] The standard of intent in *Zubeda*

is consistent with international law.

The BIA's holding in *Matter of J-E-* conflicts with the Third Circuit's holding in *Zubeda*.

The BIA held that "specifically intended" requires that a perpetrator have an actual, subjective

desire to cause severe mental or physical pain or suffering. *See Matter of J-E-*, 23 I&N Dec. at

---

[7] The Magistrate Judge in *Carry v. Holmes*, No. 02-CV-0369Sr, slip op. (W.D.N.Y. July 18, 2003) (Report, Recommendation, and Order) concluded that neither the CAT, nor the Senate Resolution, nor the implementing regulations require specific intent to cause severe mental or physical pain or suffering. In a factual situation almost identical to the one presently before this Court, the Magistrate Judge found that "[i]n assessing intent, the appropriate question is not whether Haiti subjects detainees to indefinite detention with the specific intent to torture them, but whether Haitian officials intentionally, *i.e.*, deliberately or purposefully (as opposed to accidentally or negligently) inflict severe pain and suffering upon [them]." *Carry*, slip op. at 24. This conclusion is consistent with international law insofar as it rejects a specific intent standard. The Magistrate Judge's suggestion that the *actual infliction* of severe pain or suffering must be intentional, however, appears inconsistent with his reliance on the Third Circuit's holding in *Zubeda*—that specific intent is not required and that severe mental or physical pain or suffering need only be the foreseeable consequence of a deliberate act in order to give rise to torture. *See Carry*, slip op. at 24-25. Perhaps the most likely explanation for this inconsistency is his conclusion that "[i]t is difficult to fathom how Haitian officials could subject criminal deportees such as petitioner to such conditions without intent to inflict severe mental or physical suffering upon them." *Id.* at 27. *Amicus curiae* agree with his conclusion. Even if the law required specific intent to cause pain or suffering, that requirement is met where authorities choose to detain people knowing that the conditions of detention are so harsh that severe physical or mental pain or suffering is inevitable and indivisible from the detention itself.

301 (asserting that "it [is] clear that [there] is a 'specific intent' requirement"). The BIA also referred to a statement in the legislative history of the Senate Resolution that mentions specific intent. *See id.* (*citing* Report of the Senate Committee on Foreign Relations, S. Exec. Rep. No. 101-30, at 14 (1990)). The Committee Report states that "the requirement of intent to cause severe pain and suffering is of particular importance in the case of alleged mental pain and suffering, as well as in cases where unexpectedly severe physical suffering is caused. Because specific intent is required, an act that results in unanticipated and unintended severity of pain and suffering is not torture for purposes of th[e] [CAT]." *Zubeda* analyzed the phrase "specifically intended" in the Senate Resolution and found that its use there was to exclude accidental pain and suffering from the definition of torture. *Zubeda*, 333 F.3d at 473. The same analysis applied to the Committee Report leads to the conclusion that the phrase "specific intent" is used there for the same purpose, to emphasize the exclusion of unintended pain or suffering that is well established in international law. *See Delalic*, IT-96-21-T (Trial Chamber) at para. 486. Although this legislative history makes a reference to specific intent, it does not delineate a particular standard of intent except to exclude accidental injury. Moreover, the Third Circuit's holding in *Zubeda* is consistent with the intent standard found in international law, and is reinforced by (1) substantial evidence that the phrase "specifically intended" in the Senate Resolution is not an unambiguous assertion of specific intent, (2) the presumption against an interpretation that would defeat the object and purpose of the CAT, and (3) the need to maintain internal textual consistency within the Senate Resolution and implementing regulations.

Contrary to the BIA's assertion in *Matter of J-E-*, "specifically intended" does not unambiguously require specific intent. A review of the United States Code reveals eight uses of the phrase "specifically intend[s][ed]." In six of these sections, Congress uses the phrase in

contexts that clearly do not impose a specific intent requirement and have nothing to do with the elements of a violation. For example, the section dealing with the organization of congressional committees states, "[I]f the bill or joint resolution would make [a] reduction . . . , [the Committee Report shall contain] a statement of *how the committee specifically intends the States to implement the reduction* . . . ." 2 U.S.C. § 658b(d)(3) (2000) (emphasis added).[8]  In these sections, "specifically" is used as an adverb that modifies "intend[s][ed]" in a general sense, such as the intent of Congress ("how the committee specifically intends the States to implement the reduction"), or of an educational institution ("if such letters are not used for purposes other than those for which they were specifically intended"), or of the U.S. government ("export taxes, duties, or other charges . . . specifically intended to offset the countervailing subsidy received").[9] These sections do not impose a requirement of specific intent as an element of a violation.

The two instances in which the use of "specifically intend[s][ed]" may refer to specific intent as an element of a violation do not overcome the phrase's ambiguity.  The first is the section criminalizing the domestic use of torture, but that section simply repeats the ambiguous language in the Senate Resolution and 8 C.F.R. § 208.18 (a)(5).  *See* 18 U.S.C. § 2340(1) (2000) ("'[T]orture' means an act committed by a person acting under the color of law *specifically intended* to inflict severe physical or mental pain or suffering . . . .").[10]  The other is in the short

[8] *See also* 19 U.S.C. § 1675(d)(1) (2000) (Administrative Review of Antidumping Determinations) ("The administering authority shall not revoke . . . a countervailing duty order . . . on the basis of any export taxes, duties, or other charges . . . which are *specifically intended to offset the countervailable subsidy received*.") (emphasis added); 20 U.S.C. § 1232g(a)(1)(C)(ii) (2000) (Family Educational Privacy Rights) ("[C]onfidential letters and statements of recommendation, . . . *if such letters are not used for purposes other than those for which they were specifically intended*[, shall not be made available to students].") (emphasis added); 20 U.S.C. § 1232g(a)(1)(D) (2000) (Family Educational Privacy Rights) ("A student . . . may waive his right of access to confidential statements . . . , except that such waiver shall apply to recommendations only if . . . (ii) *such recommendations are used solely for the purpose for which they were specifically intended*.") (emphasis added).

[9] *See* citations in *supra* note 8.

[10] *Amicus curiae* has found no cases interpreting 18 U.S.C. § 2340(1) to require specific intent and, indeed, has found no cases interpreting the intent requirement in 18 U.S.C. § 2340(1) at all.

title of a section dealing with punitive damages; however, the operative language of the section to which it refers uses the phrase "specific intent." 15 U.S.C. § 6604(b)(3) (2000) (Punitive Damages in Y2K Actions) ("No cap if injury specifically intended: Paragraph (1) does not apply if the plaintiff establishes by clear and convincing evidence that the defendant acted with specific intent to injure the plaintiff."). Indeed, where Congress seeks to unambiguously require specific intent as an element of a violation, it uses the words "specific intent," not the more ambiguous "specifically intended." For example, the definition of genocide found in the section implementing the Genocide Convention states, "Whoever [commits a prohibited act] *with the specific intent* to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group as such . . . shall be punished as provided in subsection (b)." 18 U.S.C. § 1091(a) (2000) (emphasis added).[11]

Given the different uses of "specifically intend[s][ed]" and "specific intent" in the United States Code, the use of the phrase "specifically intended" in the Senate Resolution cannot be deemed an unambiguous requirement of specific intent. Other interpretive aids should thus be used to determine the appropriate meaning. These aids yield substantial evidence that "specifically intended" should not be interpreted to require specific intent.

First, there is a strong presumption against interpreting "specifically intended" to require specific intent. Reservations, understandings, and declarations that defeat the object and purpose

---

[11] *See also* 10 U.S.C. § 880(a) (2000) (Uniform Code of Military Justice – Attempts) ("An act, done *with specific intent* to commit an offense under this chapter, . . . is an attempt to commit that offense.") (emphasis added); 15 U.S.C. § 6605(b)(1) (2000) (Proportionate Liability in Y2K Non-Contract Actions) ("In any Y2K action that is not a contract action, the court shall instruct the jury to answer . . . whether the defendant . . . acted *with specific intent* to injure the plaintiff.") (emphasis added); 15 U.S.C. § 6605 (c)(2)(B) (2000) (Recklessness in Y2K Non-Contract Actions) ("*[R]eckless conduct by the defendant does not constitute either a specific intent to injure,* or the knowing commission of fraud, by the defendant.") (emphasis added); 31 U.S.C. § 3729(b) (2000) (False Claims) ("For purposes of this section, . . . *no proof of specific intent to defraud is required.*") (emphasis added); 5 U.S.C. 8902a(a)(1)(D) (2000) (Debarment) ("[T]he term 'should know' means that a person, with respect to information, acts in deliberate ignorance of, or in reckless disregard of, the truth or falsity of the information, and *no proof of specific intent to defraud is required . . . .*") (emphasis added).

of the CAT are invalid as a matter of customary international law. Vienna Convention on the Law of Treaties, *opened for signature* May 23, 1969, 1155 U.N.T.S. 331 (1969), *entry into force* Jan. 27, 1980, art. 19 ("Vienna Convention"); *Restatement (Third) of the Foreign Relations Law of the United States* § 313. Indeed, the Department of Justice itself recognized this principle with respect to the "lawful sanctions" exception discussed in Section IV *infra*. *See* 8 C.F.R. § 208.18(a)(3) ("Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture."). Thus, a presumption rests against any interpretation of the Senate Resolution and implementing regulations that would defeat the CAT's object and purpose. Interpreting the words "specifically intended" to require specific intent would defeat the CAT's object and purpose. According to the Senate Committee on Foreign Relations, the purpose of the CAT is to "eliminate torture and other cruel, inhuman or degrading treatment or punishment," and ratification "will demonstrate clearly and unequivocally U.S. opposition to torture and U.S. determination to take steps to eradicate it." S. Exec. Rep. No. 101-30, at 3. As the Third Circuit noted in *Zubeda*, "[R]equiring an alien to establish the specific intent of his/her persecutors could impose insurmountable obstacles to affording the very protections the community of nations sought to guarantee under the Convention Against Torture." 333 F.3d at 474. Any definition of torture that would impose such a burden upon victims or potential victims of torture in order to claim the protection of the CAT, the FARRA, and the implementing regulations would be unduly restrictive and would drastically hamper these laws' effectiveness in achieving their purpose.

Second, a careful textual analysis of the Senate Resolution and implementing regulations reveals that if the phrase "specifically intended" were interpreted to mean "specific intent," it

21

would violate the internal consistency of the Senate Resolution and the implementing regulations. The Senate Resolution states that "the term 'acquiescence' [in Article 1 of the CAT] requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his legal responsibility to intervene to prevent such activity." Senate Resolution § II(1)(d); 8 C.F.R. § 208.18(a)(7) (restating this understanding). The Senate Committee on Foreign Relations explained that "[t]he purpose of this condition is to make it clear that both actual knowledge and 'willful blindness' fall within the definition of the term 'acquiescence' in article 1." S. Exec. Rep. No. 101-30, at 9. As noted in Section II.A *supra*, this standard does not require that the perpetrator actually intend to cause severe mental or physical pain or suffering. If one simply knows of torture and does not intervene to stop it, or is deliberately blind to acts of torture, it cannot be said that that individual had an actual, subjective desire to cause severe mental or physical pain or suffering for anyone. Nevertheless, his actions are considered torture under the Senate Resolution and the implementing regulation. *Cf. Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 354-55 (5th Cir. 2002) (holding that "'[w]illful blindness' suffices to prove 'acquiescence'" and examining whether officials in Honduras were willfully blind to torturous acts committed by private landlords in order to establish whether the CAT's definition of torture had been met); *Builes v. Nye*, 239 F.Supp.2d 518, 525 (M.D.Pa. 2003) (examining whether officials in Colombia were willfully blind to torturous acts committed by drug traffickers in order to establish whether the CAT's definition of torture had been met).

International law, U.S. case law, and a careful analysis of the Senate Resolution and implementing regulations make clear that the BIA misinterpreted "specifically intended" to graft a requirement of specific intent onto the CAT's definition of torture. When a deliberate act, like placing people in prison, results in severe mental or physical pain or suffering that was

22