foreseeable because of deplorable conditions that are known to exist, the intentionality requirement under both the CAT and U.S. law is satisfied, regardless of whether those responsible for the act had a subjective desire to cause such pain or suffering.

## III.    A PRACTICE OF DETENTION DESIGNED TO WARN CRIMINAL DEPORTEES AND TO DETER CRIME SATISFIES THE CAT'S PURPOSE REQUIREMENT.

A finding of torture under the CAT requires that the act in question be carried out "for such purposes as obtaining from [the victim] or a third person information or a confession, punishing [the victim] for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing [the victim] or a third person, or for any reason based on discrimination of any kind." CAT, art. 1.  Here, the practice of indefinite detention of criminal deportees in facilities with substandard conditions has the stated purposes of warning and deterrence.  Inherent in the purposes of warning and deterrence are two of the purposes explicitly identified in the CAT, "to intimidate" and "to punish."  The same practice, if motivated by discriminatory attitudes toward deportees, may also be consistent with an additional purpose listed in the CAT, "for . . . discrimination of any kind."  The proper legal inquiry must thoroughly examine the totality of circumstances to determine whether an act was performed with a requisite purpose.  Central to this inquiry is the recognition that legitimate purposes may underlie conduct that constitutes torture, the list of purposes within the CAT's definition of torture is not exhaustive, and additional purposes related to those explicitly listed in the CAT satisfy the purpose requirement.

23

**A.    A state practice designed to warn and deter is tantamount to intimidation and punishment and, when applied to one category of people, may have a discriminatory purpose, and thus has purposes expressly identified in the CAT.**

The CAT identifies three purposes relevant to the analysis of Haiti's detention policy: intimidation, punishment and any purpose "based on discrimination of any kind." The BIA in *Matter of J-E-* found, and Respondent here does not contest, that Haiti's detention policy is designed to warn and deter criminal deportees from engaging in criminal activity. A stated policy of detaining deportees to warn them and to deter them from committing future crimes is consistent with the purposes "to intimidate" and "to punish" expressly identified by the CAT. In addition, while Respondent and the BIA opinion below do not discuss discrimination, a policy of detaining criminal deportees in response to societal discrimination is consistent with a purpose, "for any reason based on discrimination of any kind."

In *Matter of J-E-*, the BIA found that Haiti's detention policy is designed to warn deportees and to deter them from committing future crimes. Despite this finding, the BIA summarily concluded: "[T]here [is no] evidence that Haiti's detention procedure is inflicted on criminal deportees for a proscribed purpose, such as obtaining information or a confession; punishment for a victim's or another's act; intimidating or coercing a victim or another; or any discriminatory purpose." 23 I&N Dec. at 300. In reaching this conclusion, the BIA erroneously limited its analysis to Haiti's expressly stated purposes. However, the inquiry must do more than compare the words of the alleged perpetrator's stated purposes with the list of purposes in the CAT. The proper inquiry must thoroughly examine the totality of circumstances—the meaning, function, effect, and context of the act—to determine whether an act was performed with a requisite purpose. "Only in exceptional cases should it . . . be possible to conclude that the infliction of severe pain or suffering by a public official would not constitute torture as meant in

24

the definition . . . ." Burgers & Danelius at 119; *see id.* (stating that even where an individual claims to have "purely sadistic or otherwise private motives[,] . . . there is normally also an element of punishment or intimidation which would bring the act under the definition in article 1 [of the CAT]").

In *Prosecutor v. Kunarac,* for example, Bosnian Serb soldiers "den[ied] having pursued any of the prohibited purposes listed in the definition of the crime of torture, in particular, the discriminatory purpose." *Kunarac,* IT-96-23 (Appeals Chamber) at para. 138. The ICTY, however, did not simply accept the soldiers' avowed purpose (sexual gratification). Instead, the ICTY considered the entire context in which the rapes occurred and affirmed the trial court's finding that these rapes were committed for the purposes of intimidation, coercion, discrimination, and obtaining information. *Id.* at para. 154. The fact that non-listed purposes were among the purposes driving the conduct in question did not frustrate a finding of listed purposes as well. The ICTY explained that "there is no requirement under customary international law for the act of the perpetrator to be committed *solely* for one of the prohibited purposes listed in the definition of torture," *Kunarac,* IT-96-23 (Appeals Chamber) at para. 141, or that the purpose identified by the CAT need be the dominant purpose, *id.* at para. 486 ("[T]he prohibited purpose must simply be part of the motivation behind the conduct and need not be the predominating or sole purpose."). Although the Haitian government's stated purposes are not among those expressly identified by the CAT, the government conduct must be subjected to an analysis that examines context, meaning, and effect in order to determine all of the actual purposes underlying the acts in question.

In this case, seeking to achieve "warning" and "deterrence" by detaining deportees in facilities that are known to be substandard is tantamount to intimidation. The BIA found that

Haiti implemented its detention policy to serve as a warning and deterrent so that repatriated Haitians will not engage in criminal activity.[12] *See Matter of Guillaume*, slip op. (BIA Apr. 11, 2002) (relying on *Matter of J-E-*, 23 I&N Dec. at 300, in which the BIA found "Haitian authorities detain criminal deportees 'as a warning and deterrent not to commit crimes in Haiti.'"). But the BIA failed to subject the stated purposes to any analysis to determine their full meaning and content. The record here suggests that intimidation is inherent in Haiti's detention policy. The U.S. Department of State, for example, reported that according to a Haitian prosecutor, the Haitian government keeps deportees in jail with no timetable for release as "'preventative measures' . . . taken to prevent the 'bandits' from increasing the level of insecurity and crime in the country." State Dep't Report (Resp't Ex. at 4).

The record supports a finding that Haiti's detention policy may also include punishment as one of its purposes. Haiti's stated purpose in implementing the detention policy—deterrence—suggests an element of not only intimidation, but also punishment. Indeed, in the criminal context, deterrence is "the prevention of criminal behavior by fear of punishment." *Black's Law Dictionary* 460 (7th ed. 1999). Given the conditions described by the record in this case, imprisonment in Haiti is punishment that is designed to *create fear of additional punishment*—in the form of beatings and starvation, for example—within prison walls. In addition, the record itself indicates that Haiti's treatment of returned criminals has a punitive element. Amnesty International, for example, reported that in 1999 prison officials beat several detainees, "in most cases as punishment." Amnesty Int'l, *Annual Report 2000: Haiti* (2000)

---

[12] *Amicus curiae* note that torture may be found where intimidation is directed at an entire community, not only the victim. A former United Nations Special Rapporteur on Torture explains that "[torture] has also become a method of inspiring fear among the population at large, or specific segments of it." Nigel S. Rodley, *The Treatment of Prisoners Under International Law* 7 (2d ed. 1999); *see, e.g., Kunarac*, IT-96-23 (Trial Chamber); *Prosecutor v. Akayesu*, ICTR-96-4-T (ICTR Trial Chamber I, Sept. 2 1998), *aff'd* (ICTR Appeals Chamber, June 1, 2001). The record in this case does not indicate clearly whether Haiti's stated purposes of warning and deterrence involves intimidating the detainee *and* the Haitian population as whole.

(Resp't Ex. at 73). In *Matter of J-E-*, the BIA cited the State Department's report that beatings were "pervasive," but found that the record did not establish a likelihood that the petitioner would be subject to severe beatings inside the prison. *Matter of J-E-*, 23 I&N Dec. at 301-02. Nevertheless, the documented pattern of beatings further demonstrates that punishment, explicitly identified as a purpose in the CAT, is part and parcel of the detention policy. Both the documented beatings and the fact that criminal deterrence involves punishment reinforce the conclusion that Haiti's detention policy has a punitive purpose. Thus, even if Haiti's stated purpose uses the language of warning and deterring, those purposes are virtually equivalent to intimidation and punishment.

For these reasons, a U.S. Magistrate Judge recently found that Haiti's detention policy has purposes the CAT expressly establishes as prerequisites for torture. Noting the Haitian government's goals of preventing banditry and deterring crime,[13] the Magistrate Judge in *Carry v. Holmes* held:

> [I]t is clear that the intent of Haiti's indefinite detention policy is *to punish* criminal deportees for their prior crimes and *to intimidate* them so that they will not be tempted to commit crimes in the future. *This is a proscribed purpose pursuant to the CAT's definition of torture.*

*Carry*, slip op. at 23 (emphases added); *see id.* at 25 (observing that detainees receive poor treatment "as punishment for their past crimes and as a deterrent from committing crimes in the future").

Lastly, although the BIA decision did not discuss whether Haiti implemented its detention policy for a discriminatory purpose, the record suggests that intense societal

---

[13] The Magistrate Judge in *Carry v. Holmes* referred to the BIA decision below in that case: "[T]he BIA concedes that the purpose of Haiti's detention policy is 'to prevent the "bandits" from increasing the level of insecurity and crime in that country.' More specifically, the BIA found that 'Haitian authorities detain criminal deportees "as a warning and a deterrent not to commit crimes in Haiti."'" *Carry*, slip op. at 22 (internal citations omitted).

discrimination and government scapegoating of returned criminals underlie the policy. The

director of an advocacy program for criminal detainees in Haiti stated:

> [Criminal detainees] are subjected to illegal detention and degrading treatment
> primarily because of intense discrimination against them by Haitian society. This
> discrimination is fueled by the government of Haiti and the police who use the
> criminal deportees as scape goats [sic] when discussing crime and insecurity.

Statement of Michelle Karshan, Exec. Dir. of Alternative Chance: Advocacy for Criminal

Deportees in Haiti (Aug. 30, 2000) (Resp't Ex. at 19). Such a discriminatory basis for a

detention policy falls directly within one of the purposes expressly listed in CAT's definition of

torture, namely "for any reason based on discrimination of any kind." CAT, art 1.

In sum, the BIA decision below and the record in this case indicate that the purposes of

the Haitian detention policy are to warn detainees, to prevent banditry, and to deter future

criminal activity. These goals amount to or inherently include the purposes of intimidation and

punishment, which explicitly satisfy the purpose requirement of the CAT. The record also

supports the conclusion that the detention policy has a discriminatory basis, which would further

satisfy the CAT's purpose requirement. This Court need not look outside the purposes listed in

the CAT to determine that Haiti's detention policy meets the CAT's purpose requirement.

### B.    Acts may constitute torture even if the purposes of those acts are legitimate.

In finding that "warning" and "deterrence" did not constitute purposes identified in the

CAT, the BIA relied heavily on the fact that "Haiti has a legitimate national interest in protecting

its citizens from increased criminal activity," *Matter of J-E-*, 23 I&N Dec. at 300, and its

incorrect understanding that an "illicit purpose" is required for a finding of torture. *Id.* at 298.

*Amicus curiae* agree that protecting the citizenry is an important state interest. Under the CAT,

however, it is no defense to argue that an otherwise torturous act serves a legitimate purpose.

28

Indeed, several purposes listed in the CAT itself, including punishment and obtaining a

confession, are legitimate state interests. Policies to achieve such purposes do not violate the

CAT, "on [the] condition that *legitimate methods* are used to achieve them." Burgers &

Danelius at 118 (emphasis added). In short, conduct based on legitimate purposes is permissible

only to the extent the conduct itself is permissible; impermissible conduct, whether motivated by

legitimate or illegitimate purposes, is still impermissible. This Court may find that Haiti's

detention of returned criminals in the conditions reflected in the record constitutes torture even if

the purposes underlying the detention policy are themselves entirely legitimate.

> C.  **When determining whether an act constitutes torture, purposes other than those expressly listed in the CAT may satisfy the CAT's purpose requirement.**

Under U.S. and international law, a finding of torture does not require a finding that the

act was performed with a purpose expressly identified in the CAT. The CAT states that conduct

will constitute torture if it is carried out "for *such* purposes *as* . . . ." CAT, art. 1 (emphases

added). The "such . . . as" language makes the definition's list of purposes illustrative, not

restrictive. Domestic and international law consistently agree that the list of purposes within the

CAT's definition of torture is not exhaustive. *See, e.g., Matter of J-E-*, 23 I&N Dec. at 298

("The definition of torture illustrates, but does not define, what constitutes a proscribed or

prohibited purpose."); S. Exec. Rep. No. 101-30, at 14 ("The purposes given are not exhaustive,

as is indicated by the phrasing 'for such purposes as.' Rather, they indicate the type of

motivation that typically underlies torture, and emphasize the requirement for deliberate

intentions or malice."); *Prosecutor v. Akayesu*, ICTR-96-4-T, at para. 597 (Trial Chamber I Sept.

2, 1998), *aff'd* (ICTR Appeals Chamber, June 1, 2001). Thus, this Court need not determine that

Haiti's stated purposes of warning and deterring fall squarely within one or more of the CAT's listed purposes.

Although the CAT's list of purposes is not exhaustive, a finding of torture under the CAT requires that the act in question be for a purpose related to purposes the CAT *does* identify. *See* Burgers & Danelius at 118 ("The words 'such . . . as' imply that the other purposes must have something in common with the purposes expressly listed [in the CAT]"). According to Burgers and Danelius, "the common element of the purposes referred to in the definition should rather be understood to be the existence of some—even remote—connection with the interests or policies of the State and its organs." *Id.* at 118-19. Because the object of the CAT is to eliminate torture committed or sanctioned by government officials, purposes that provide a predicate for a finding of torture must relate to the interests or policies of the state or its officials.

The conclusion that acts of torture can be based on purposes not explicitly identified in the CAT finds support in other conventions concerning torture, court decisions, and comments by jurists. The Inter-American Convention, for example, defines torture as acts committed "for purposes of criminal investigation, as a means of intimidation, as personal punishment, *as a preventive measure, as a penalty, or for any other purpose.*" Inter-American Convention, art. 2, para. 1 (emphasis added).[14] *See, e.g.,* Case 10.832, at para. 85 (finding that the state's justification for continuing to detain a prisoner after four domestic courts ordered his release— because he represented "'a danger to the country'"— "illustrate[s] the purposes of the act of torture to which Article 2 of the Inter-American Convention to Prevent Torture refers."). Under the Inter-American Convention, conduct may also constitute torture if its purpose is "to obliterate the personality of the victim or to diminish his physical or mental capacities." Inter-American

---

[14] Haiti signed but did not ratify the Inter-American Convention to Prevent and Punish Torture. The United States has neither signed nor ratified the Convention.

Convention, art. 2, para. 1. The Inter-American Convention's conception illustrates that the international understanding of the purposes that can constitute torture is broad and inclusive, consistent with the goal of eliminating torture.

International tribunals have also found torture where the act was performed to achieve purposes not mentioned in the CAT. In *Prosecutor v. Akayesu,* the ICTR found the accused guilty of crimes against humanity, including rape. The Tribunal adopted the essential elements of the CAT's definition of torture and construed rape as torture when it is "used for such purposes as intimidation, *degradation, humiliation,* discrimination, punishment, *control* or *destruction of a person.*" ICTR-96-4-T (Trial Chamber I) at para. 687 (emphases added). Similarly, the ICTY has found that humiliation, though not listed in the CAT, is a purpose that can provide the predicate for a finding of torture:

> [T]he Trial Chamber considers that among the possible purposes of torture one must also include that of humiliating the victim. This proposition is warranted by the general spirit of international humanitarian law: the primary purpose of this body of law is to safeguard human dignity. The proposition is also supported by some general provisions of such important international treaties as the Geneva Conventions and Additional Protocols, which consistently aim at protecting persons not taking part, or no longer taking part, in the hostilities from "outrages upon personal dignity." *The notion of humiliation is, in any event close to the notion of intimidation, which is explicitly referred to in the Torture Convention's definition of torture.*

*Furundžija,* IT-95-17/1-T (Trial Chamber) at para. 162 (citation omitted) (emphasis added). These international tribunal decisions illustrate that the appropriate interpretation of the CAT's purpose component is holistic and flexible; the requirement is satisfied where acts are committed for a wide range of purposes related to the state's interests, including interests that may themselves be legitimate.

Haiti's stated purposes for the detention policy—warning and deterrence—are clearly related to the purposes expressly identified in the CAT, at least as clearly related as humiliation

31

is to intimidation. International law confirms that the list of purposes in the CAT's definition of

torture is not exhaustive and that purposes that are even remotely related to the purposes

identified in the CAT may satisfy the purpose requirement. Even if the purposes of the acts are

legitimate, this Court has wide latitude to locate, both within the examples listed in the CAT and

the larger categories of "purpose" that the CAT's list illustrates, a purpose or purposes requisite

for a finding that Haiti's detention of criminal deportees constitutes torture. The Haitian

government's stated purposes of warning and deterrence fit within that latitude.

## IV.  THE "LAWFUL SANCTIONS" EXCEPTION MUST BE STRICTLY CONSTRUED IN ORDER TO PREVENT STATES FROM CIRCUMVENTING THE CAT'S PROHIBITION OF TORTURE.

Although the CAT's definition of torture excludes suffering "arising from, inherent in or

incidental to lawful sanctions," a government cannot exempt otherwise torturous acts from the

CAT's prohibition by merely authorizing a state practice under domestic law.[15] First, the CAT

and U.S. implementing regulations expressly recognize that lawful sanctions are valid only if

they do not defeat the CAT's object and purpose. Second, in order for a practice to constitute a

lawful sanction, it must comport with international law as well as domestic law. Finally,

decisions from the highest courts of several States Parties to the CAT reveal that the categorical

prohibition of torture trumps all national interests, thus leaving no room for a state to claim

public policy justifications for torturous acts or omissions.

### A.    A government practice cannot qualify as a lawful sanction if it defeats the object and purpose of the CAT to prohibit torture.

Under international law, the CAT does not allow any practice that contravenes its object

and purpose. *See* Vienna Convention, art. 31(1) ("A treaty shall be interpreted in good faith in

---

[15] The Magistrate Judge in *Carry* indicated that this detention policy may not be lawful under Haitian law. *Carry*, slip op. at 20-21.

accordance with the ordinary meaning to be given to the terms of the treaty in their context and

in the light of its object and purpose."); *cf. id.* at art. 19 (stating that States Parties to a treaty

cannot make reservations that are "incompatible with the object and purpose of the treaty");

*Restatement (Third) of the Foreign Relations Law of the United States* § 313 (same). In its

Preamble, the CAT invokes Article 55 of the United Nations Charter (recognizing the

"obligation of States . . . to promote universal respect for, and observance of, human rights and

fundamental freedoms") as well as Article 5 of the Universal Declaration of Human Rights and

Article 7 of the International Covenant on Civil and Political Rights (stating that "no one may be

subjected to torture or to cruel, inhuman or degrading treatment or punishment"). The Preamble

also states the goal of "mak[ing] more effective the struggle against torture and other cruel,

inhuman, or degrading treatment or punishment throughout the world." The Senate Committee

on Foreign Relations has expressly stated that the purpose of the CAT is to "eliminate torture and

other cruel, inhuman or degrading treatment or punishment." S. Exec. Rep. No. 101-30, at 3.

Likewise, one commentator has stated that "the purpose of the Convention was to *strengthen* the

*existing* prohibition of torture and prevent torture." Chris Ingelse, *The UN Committee against

Torture* 213 (2001). Applying the Vienna Convention, then, the CAT would not recognize a

state-sanctioned act as a "lawful sanction" if it contravened the CAT's object and purpose to

prohibit torture.

   Furthermore, U.S. regulations implementing the CAT expressly state that lawful

sanctions "do not include sanctions that defeat the object and purpose of the Convention Against

Torture to prohibit torture." 8 C.F.R. §208.18(a)(2). This regulation codifies a reading of the

CAT consistent with the Vienna Convention: The CAT does not provide any "safe haven" for

torturous acts that defeat its object and purpose. The U.S. implementing regulations affirm a

basic principle of the CAT that a government practice authorized by domestic law may still constitute torture.

A government-authorized detention policy that utilizes, enables, or encourages torturous acts or omissions would not be valid since it would defeat the object and purpose of the CAT.  In its decision below, the BIA relied almost exclusively on its previous ruling in *Matter of J-E-* that Haiti's policy of detaining criminal deportees constitutes a lawful sanction.  The BIA in *Matter of J-E-* found that "there is no evidence that Haiti's detention policy is intended to defeat the purpose of the Convention to prohibit torture." 23 I&N Dec. at 300.  In its determination, however, the BIA introduced an intent requirement that has no place in the application of the "lawful sanctions" clause.  The crucial test under the CAT and U.S. regulations is whether a sanction *in practice* defeats the CAT's object and purpose to prohibit torture.  Such a sanction cannot be considered a lawful sanction, regardless of whether the government deliberately seeks to defeat the CAT's object and purpose.

**B.     A government practice must comport with international law in order to qualify as a lawful sanction.**

The CAT requires that a domestic sanction comport with international law in order to constitute a lawful sanction.  According to the CAT and U.S. regulations, whether a state-sanctioned act or omission constitutes torture ultimately depends on its consistency with the object and purpose of the CAT, which is itself an instrument of international law.  Furthermore, the United Nations Committee Against Torture has explicitly stated that only sanctions that are consistent with international law can qualify for the "lawful sanctions" designation.  In discussing criminal penalties in Kuwait, for example, the Committee explained that "the 'sanctions' mentioned in article 1 must not only be lawful under domestic law but also in terms

34

of basic internationally recognized norms. The *type of punishment* imposed was in that respect a

vital element." Comm. Against Torture, Summary Record of the 334th Meeting: Kuwait, New

Zealand, Oct. 19, 1998, U.N. Doc. CAT/C/SR.334, *available at* http://www.unhchr.ch/tbs/

doc.nsf/385c2 add1632f4a8c12565a9004dc311/30f173e334d03ba1802566a5003d7229?

OpenDocument (emphasis added). In determining whether or not a domestic penalty comports

with international norms (and can thus qualify as a lawful sanction), the means of punishment

must be considered.

   Examples of punishments allowable under the CAT and international law further

illustrate that compliance with domestic law is insufficient to establish a government practice as

a lawful sanction. In discussing the legality of corporal punishment, the Special Rapporteur on

Torture has stated that the "'lawful sanctions' exclusion must necessarily refer to those sanctions

that constitute practices widely accepted as legitimate by the international community, such as

deprivation of liberty through imprisonment, which is common to almost all penal systems."

Report of the Special Rapporteur, Mr. Nigel S. Rodley, Submitted Pursuant to Commission on

Human Rights Resolution 1995/37 B, Jan. 10, 1997, U.N. Doc. E/CN.4/1997/7, *available at*

http://www.hri.ca/fortherecord1997/documentation/commission/e-cn4-1997-7.htm. By contrast,

as the Canadian government asserted before the Committee Against Torture, under the lawful

sanctions exception, "imprisonment and the *normal* conditions of detention do not as such

constitute torture as defined by the Convention [Against Torture] and interpreted by the

Committee." Comm. Against Torture, Communication No. 57/1996: Canada, Nov. 17, 1997,

U.N. Doc. CAT/C/19/D/57/1996, *available at* http://www.unhchr.ch/tbs/doc.nsf/385c2add

1632f4a8c12565a9004dc311/9f518ac7f91311dd802566f2003fda8e?OpenDocument (emphasis

added). Since a government practice must comport with international law in order to constitute a

valid lawful sanction under the CAT, standard imprisonment could qualify as a lawful sanction, but deliberate imprisonment in a facility that is grossly inadequate, in which it is foreseeable that deplorable conditions will cause severe mental or physical pain or suffering, would not.

**C.    Under the CAT, review of government practices must consider both the policies served and methods used to achieve those policies, and even the most compelling policy goal cannot provide sufficient justification for employing torture.**

Even if a state has legally sanctioned a practice for the legitimate goal of promoting public safety, the lawful sanctions exception provides no defense to practices that amount to torture. In *Public Committee Against Torture in Israel v. Israel*, the Supreme Court of Israel considered whether General Security Service interrogators could legitimately employ torture to obtain information that might prevent terrorist attacks. H.C. 5100/94, *Pub. Comm. Against Torture in Israel v. Israel* (1999). The Court grappled with a "collision of values" analogous to the concerns at the heart of attempts to "lawfully sanction" torture. *Id.* at 16. As the Court recognized, "*On the one hand*, lies the desire to uncover the truth, thereby fulfilling the public interest in exposing crime and preventing it. *On the other hand*, is the wish to protect the dignity and liberty of the individual being interrogated." *Id.* at 15. The Court held that various interrogation techniques—including shaking and forcing suspects to assume painful positions— were unacceptable means of eliciting information. *Id.* at 17-18. In condemning torture, the Court concluded that the prohibition on torture could not be compromised even where the interest of national security was at stake: "These prohibitions are 'absolute'. There are no exceptions to them and there is no room for balancing. Indeed, violence directed at a suspect's body or spirit does not constitute a reasonable investigation practice." *Id.* at 17. Terrorist attacks are at least as great a threat to Israel as the acts of criminal deportees are to Haiti.

Acknowledging the dire national security interests at stake, *id.* at 26, the Supreme Court of Israel nonetheless recognized that its obligations under international law to prevent torture took precedence over countervailing interests to prevent domestic terrorism.

The Supreme Court of Canada recently ruled that national security concerns could not justify violations of the obligation to prohibit torture in a case involving the deportation of a suspected terrorist to Sri Lanka. In *Suresh v. Canada*, [2002] 1 S.C.R. 3, the Court considered the deportation of the appellant, whom the Minister of Citizenship and Immigration had deemed a threat to Canadian national security, to a state where he faced almost certain torture. *Id.* at para. 16. In balancing Canada's obligations under the CAT and the International Covenant on Civil and Political Rights against its internal security concerns, the Court concluded "that the better view is that international law rejects deportation to torture, even where national security interests are at stake." *Id.* at para. 75. Like the decision of the Supreme Court of Israel, the Canadian Court's holding illustrates that under international law, state action can never lawfully facilitate torture, even if such action serves the most significant public interest, national security. The Court stated, "The rejection of state action leading to torture generally, and deportation to torture specifically, is virtually categoric. Indeed, both domestic and international jurisprudence suggest that torture is so abhorrent that it will almost always be disproportionate to interests on the other side of the balance, even security interests." *Id.* at para. 76.

Evaluations of potential "lawful sanctions" must not stop with a determination that the conduct in question is authorized by domestic law or that a national interest is at stake. If the act otherwise contravenes the CAT's prohibition on torture, the invocation of neither domestic law nor vital national interests can transform the act into a lawful sanction. In *Matter of J-E-*, the BIA characterized Haiti's detention policy as a lawful sanction largely because "Haiti has a

37

legitimate national interest in protecting its citizens from increased criminal activity." *Matter of J-E-*, 23 I&N Dec. at 300. While the goal of public safety is legitimate, a government practice that employs torture can never be valid, no matter how important or pressing the public interest it serves. Any justification for subjecting criminal deportees to torturous conditions on public safety grounds would contravene international precedent and the categorical international prohibition against torture.

## CONCLUSION

For the foregoing reasons, *amicus curiae* concludes that the detention policy of the Haitian government revealed by the record in this case satisfies the intent and purpose requirements of Article 1 of the CAT. If this Court finds that Haiti's detention of criminal deportees constitutes torture, the practice cannot be redeemed by calling it a "lawful sanction." To the extent that the conclusions of law made by the BIA below and in *Matter of J-E-* state otherwise, these decisions are erroneous.

Respectfully submitted,

Mary J. Hahn
Allard K. Lowenstein International
     Human Rights Clinic
Yale Law School
127 Wall Street
P.O. Box 208215
New Haven, Connecticut 06520
Telephone: (203) 432-8368
Facsimile: (203) 432-8260

## CERTIFICATE OF SERVICE

I certify that on the 15th day of December 2003, I served the original of the above and foregoing upon the Court by hand, and Petitioner and Respondent (the "Parties") by sending one copy each to attorneys for the Parties by depositing same, postage prepaid, in an official depository of the U.S. Postal Service properly addressed as follows:

Michael J. Boyle
169 Montowese Avenue
North Haven, CT 06473

Krishna R. Patel
U.S. Attorney's Office
157 Church Street
P.O. Box 1824
23rd Floor
New Haven, CT 06510

Dated: December 15, 2003

Mary J. Hahn