UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KERVINGS GUILLAUME,          :
Petitioner,                  :
                             :
v.                           :    CIV. NO. 3:02CV1276(RNC)
                             :
JOHN ASHCROFT, et. al.       :
Respondents.                 :

## RESPONDENTS' SUPPLEMENTARY MEMORANDUM OF LAW IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

### Preliminary Statement

Respondents/Defendants John Ashcroft, Attorney General of the United States, U.S. Immigration and Naturalization Service,[1] Steven J. Farquharson, District Director and Gary Cote, Officer-in-Charge respectfully submit this supplemental memorandum of law in opposition to the petition for writ of habeas corpus ("petition") filed by petitioner Kervings Guillaume ("Guillaume" or "petitioner").

Guillaume challenges a decision of the Board of Immigration Appeals ("BIA") denying his application for deferral of removal under the Convention Against Torture ("the CAT").[2] Guillaume contends that if returned to Haiti he will be detained in a

---

[1]    On March 1, 2003, the INS was abolished and its functions were transferred to three separate bureaus within the Department of Homeland Security ("DHS"). Because all pertinent documents in this case refer to the INS, the Government will refer to the DHS and INS interchangeably.

[2]    United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, opened for signature Dec. 10, 1984, art. 3, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 113, 114.

Haitian prison where he will be subject to torture because of the deplorable conditions of Haitian prisons.  While the conditions of Haitian prisons are harsh and cannot be condoned, Guillaume's temporary detention which is part of a lawful deterrent policy employed by the Haitian Government does not constitute torture under the CAT.

## Statement of Facts

### A.    Immigration and Criminal History

Guillaume, a native and citizen of Haiti, was admitted to the United States as an immigrant on or about June 8, 1991 when he was approximately fourteen years of age.  (See A 1, 3).[3] Since entering the United States in 1991, Guillaume has accumulated a serious criminal history.

On August 6, 1998 Guillaume was arrested for assaulting an officer, interfering/resisting arrest and assalt in the second degree.  (A 4, 6).  Based on a plea transcript, Guillaume's arrest stemmed from an incident during which Guillaume was yelling at people and causing a disturbance in a parking lot of an apartment complex in Stamford, Connecticut at which time he appeared to be drunk.  When Anthony Thomas ("Thomas") told

---

[3]     References to "A _" are to copies of pertinent documents that were obtained from Guillaume's immigration file and were attached to the Government's August 16, 2002 response to the petition for a writ of habeas corpus.  These documents are again attached as Exhibit A to the Patel Decl. for the Court's easy reference.

Guillaume to go home.  (A 14-15).  Guillaume began throwing punches at Thomas.  (Id.).  To defend himself, Thomas grabbed Guillaume who then bit Thomas on the back.  As police officers intervened to stop the fight, Guillaume threw another punch at Thomas.  (Id.).  When officers attempted to grab Guillaume, his punch "was deflected but [Guillaume] then punched Officer Wolf in the arm."  (Id.).  Guillaume tried to spit on the officers two times but missed.  (See Id.).  On February 17, 1999, Guillaume pled guilty and was convicted of assault in the second degree and interfering/resisting arrest, in violation of Conn. Gen. Statute §§ 53a-60 and 53a-167a, respectively, for which he was sentenced to five years' imprisonment, two years to serve, and three years' probation.  Guillaume was also sentenced to a one-year concurrent term of imprisonment for interfering/resisting arrest.  (See A 4, 6).

On August 10, 1998, Guillaume was arrested for assault in the third degree.  Based on the plea transcript, this arrest stemmed from an indictment in which Guillaume approached the car of his former girlfriend Tamika Hines.  (See A 15).  Guillaume instructed Ms. Hines to roll down the window.  (See Id.) Guillaume then punched Ms. Hines in the left eye.  When Ms. Hines tried to defend herself, Guillaume "kept punching at her." (Id.).  On June 10, 1999, Guillaume pled guilty to assault in the third degree in violation of Conn. Gen. Stat. § 53A-61 for which

he was sentenced to one year in jail to be served concurrently. (<u>See</u> A 4, 6).

On January 14, 1999, Guillaume was arrested for threatening, criminal mischief, reckless endangerment and interfering/resisting arrest. (<u>See</u> A 6). Based on a plea transcript, Guillaume became upset wih Tamika Hines, "grabbed a butcher knife and placed it nder her throat.". (<u>See</u> A 16). Guillaume threatened Ms. Hines stating that "if he could not have her, then no one could." (<u>See</u> A 16). Other individuals in the apartment managed to push Guillaume away. (<u>Id.</u>). Guillaume then "cut up" Ms. Hines's coat. (<u>See</u> A 16). On June 10, 1999, Guillaume was convicted of threatening and criminal mischief in violation of Conn. Gen. Stat. §§ 53a-62 and 53a-117 for which he was sentenced to a concurrent term of six months' imprisonment. (<u>See</u> A 4, 6).

## B.  Guillaume's Immigration Proceedings

Based on the June 10, 1999 conviction for assault in the second degree, the former INS served Guillaume with a Notice to Appear ("NTA") charging that he was subject to removal from the United States pursuant to 8 U.S.C. §1227(a)(2)(A)(iii) (Supp. IV 1998) of the Immigration and Nationality Act of 1952, as amended ("INA"), as an alien convicted of an aggravated felony, as that term is defined in 8 U.S.C. § 1101(a)(43)(F) (crime of violence for which the term of imprisonment is at least one year). (A 1-

4

2); see also 8 C.F.R. § 239.1(a) (1999) (removal proceedings "commenced by the filing of a notice to appear with the Immigration Court").

On July 13, 2000, Guillaume's removal proceedings commenced before an Immigration Judge ("IJ") in Hartford, Connecticut. (A 34). At that time, the IJ explained the charges contained in the NTA and adjourned the proceedings to provide Guillaume an opportunity to retain counsel. (A 37-38). The IJ then gave Guillaume two more continuances so that he could attempt to retain counsel. (A 40-41, 46-47). When the hearing resumed on March 9, 2001, Guillaume appeared with his counsel, Michael Boyle, Esq. (A 48-52). The IJ rescheduled the hearing until May 17, 2001 to permit Guillaume an opportunity to file an application for relief under the CAT. (Id.).

At the continued hearing, Guillaume, through his counsel, admitted all of the allegations in the NTA, conceded removability and sought withholding of removal under the CAT to Haiti. (A 54). Guillaume conceded that because of the length of his sentence, he is not eligible for any other form of relief. (A 54-55).

The hearing was then again continued until July 11, 2001 at which time, Guillaume, testified in support of his application. Specifically, Guillaume testified that, when he was thirteen years old, his mother brought him and his two siblings to the

United States from Haiti in 1991.  (See A 68-69, 73).  Guillaume
stated that he graduated from high school in the United States.
(A 72).  In addition to English, petitioner can also speak
Creole.  (A 74-75, 61).  Guillaume claimed that he no longer has
family members in Haiti and that he has not left the United
States since his arrival.  (A 70, 73).  Guillaume stated that
prior to his incarceration he was in school and working to
support himself and help his family.  (A 71).  Guillaume's mother
works as a babysitter and supports his younger brother.  (A 71-
71).  Guillaume testified that he has never been in a Haitian
prison.  (A 72).  Guillaume also testified that while in Haiti he
lived with his mother and uncle.  (A 72).

Guillaume's attorney argued that petitioner's "testimony"
"indicates that he would be at a special risk" in "the prison
system of Haiti" (A 73-74).  Guillaume's attorney further claimed
that criminal deportees are "at particular risk" because "they
have lost their immunity to the microbes and parasites in Haitian
water" and because "most of them" have "no significant contact"
in Haiti to bring them food and boiled water in prison and "to
bribe guards to help prevent physical abuse."  (A 74).

The Government's attorney pointed out that there is no proof
that petitioner would be imprisoned upon his return to Haiti (A
37) and that even if petitioner were to be incarcerated, he would
be subject to general poor jail conditions in Haiti which are not

directed at him specifically.  (A 77).

## I.   The IJ's Decision

By order dated July 11, 2001, the IJ denied Guillaume's application for protection under the CAT and ordered his removal from the United States to Haiti.  (See A 88 (IJ's Order)).  In its decision, the Court summarized Guillaume's testimony (A 90-91), and various reports and newspaper articles which described conditions in Haitian prisons.  (See A 91-94).

In denying petitioner's sole claim under the CAT, the Court concluded that Guillaume had failed to meet his burden of proof that it is more likely than not that he would be tortured if returned to Haiti.  (See A 97-99).  The Court noted that "Haiti is a very poor country and it does not appear that the government has the resources to maintain an adequate prison system." (See A 98).  Based on the record before the Court, the IJ stated that that "torture constitutes deliberate, inhuman treatment causing very serious and cruel suffering.  Incidental harm without specific intent to harm does not constitute torture."  (See Id.).  Specifically, the IJ stated that:

> There is no evidence that, while conditions in the
> Haitian prison system are very poor for anyone who is
> detained in that system, there would be any intentional
> infliction of harm by the authorities.  It appears that
> persons who are detained in Haiti face very poor
> conditions, but that does not rise to the level of
> torture as required in the Torture Convention.  The
> Court finds that the Respondent has not shown that
> there would be any intention by the authorities to
> inflict pain and suffering on the respondent as

7

> required in the regulation. [citation omitted].  The
> Court finds that there's not a specific intent by the
> authorities in Haiti to torture the Respondent.  While
> the Court is certainly concerned about the lack of food
> and adequate hygiene in the Haitian prison system,
> again, there is no evidence that the authorities use
> this to intentionally harm prisoners in that country.
> Haiti is a very poor country and it does not appear
> that the government has the resources to maintain an
> adequate prison system.

(A 98).

## II.  **The BIA's Decision**

On April 11, 2002, the BIA affirmed the IJ's decision

denying Guillaume's application for CAT relief.  (See A 102).

Citing Matter of J-E, 23 I&N Dec. 291 (BIA 2002), the BIA held

that:

> neither indefinite detention nor inhuman prison
> conditions in Haiti constitutes torture.  We
> specifically noted that there is no evidence that
> either of these actions by the Haitian government is
> done with the specific intent to inflict severe pain or
> suffering, or to otherwise defeat the purpose of the
> Convention Against Torture [citation omitted].
> Moreover, although we recognize that isolated acts of
> torture occur in Haitian detention facilities, there is
> insufficient evidence in the record to establish that
> it is more likely than not that the [petitioner] will
> be subjected to this severe mistreatment if he is
> detained upon his return to Haiti [citation omitted].

(See A 102)

## 3.  **Petition for Review**

On April 22, 2002, Guillaume filed a petition for review and

an "emergency stay of deportation" in the United States Court of

Appeals for the Second Circuit.  (See A 103).

8

On July 23, 2002, Guillaume filed a habeas petition and a motion for a stay of removal in the District Court for the District of Connecticut seeking CAT relief. On July 24, 2002, this Court issued an order to show cause and granted petitioner's motion for a stay. (See A 105-06).[4]

On or about July 25, 2002, Guillaume, represented by counsel, and the Government, represented by the United States Attorney's Office for the Southern District of New York, agreed by stipulation to dismiss the petition for review "with prejudice." (See A 107). On July 30, 2002, the Second Circuit ordered that petitioner's motion for a stay "is moot in light of stipulation dismissing appeal." (See A 108).

**ARGUMENT**

**THE BIA PROPERLY DENIED
GUILLAUME'S APPLICATION FOR CAT RELIEF**

**A.    The Statutory Framework of the CAT**

The CAT was adopted by the United Nations General Assembly on December 10, 1984, and signed by the United States on April 18, 1988. See Report of the Senate Committee on Foreign Relations ("Senate Report"), Exec. Rep. No. 101-30, at 1 (1990). Article 3 of the CAT provides that "[n]o State Party shall expel,

---

[4]    In his motion to stay removal in this Court, petitioner alleged that "[t]he practice of the Hartford INS is to remove individuals in Petitioner's position, notwithstanding the pendency of a habeas corpus action" (Motion dated July 23, 2002, p. 2). That conclusory accusation is inaccurate and unsupported by any facts.

return ('<u>refouler</u>') or extradite a person to another State where
there are substantial grounds for believing that he would be in
danger of being subjected to torture."

The President signed the treaty and the ratification
instrument was deposited with the United Nations in 1994.  <u>See</u> 64
Fed. Reg. 8478, 8478 (Feb. 19, 1999).  The CAT was transmitted to
the Senate in 1988 for ratification "subject to certain
reservations, understandings, and declarations."  <u>See</u> Message
From the President Transmitting the CAT, Treaty Doc. No. 100-20,
at iii (1988).  The President recommended, <u>inter alia</u>, the
following understanding ("Article 3 understanding"):

> The United States understands the phrase, "where there
> are substantial grounds for believing that he would be
> in danger of being subjected to torture," as used in
> Article 3 of the Convention, to mean "if it is more
> likely than not that he would be tortured."

<u>Id.</u> at 6.  The Supreme Court, in <u>INS v. Stevic</u>, 467 U.S. 407
(1984) had previously interpreted the INA's withholding-of-
deportation provision as applying only where an alien "more
likely than not" would be persecuted if deported.  <u>Id.</u>  The
purpose of the Article 3 understanding was "[t]o clarify that
Article 3 [of the CAT] is not intended to alter this standard of
proof."  <u>Id.</u>; <u>see</u> Senate Report at 10, 16, 36, 41.

The Senate offered its advice and consent, including, <u>inter
alia</u>, the following understandings in its resolution of
ratification:

10

That with reference to Article 1, the United States
understands that, in order to constitute torture, an
act must be <u>specifically intended to inflict severe
physical or mental pain or suffering</u> and that mental
pain or suffering refers to prolonged mental harm
caused by or resulting from: (1) the <u>intentional
infliction</u> or threatened infliction of <u>severe physical
pain or suffering</u>; (2) the administration or
application, or threatened administration or
application, of mind altering substances or other
procedures calculated to disrupt profoundly the senses
or the personality; (3) the threat of imminent death;
or (4) the threat that another person will imminently
be subject to death, severe physical pain or suffering,
or the administration or application of mind altering
substances or other procedures calculated to disrupt
profoundly the senses or personality . . . .

That the United States understands the phrase, "where
there are substantial grounds for believing that he
would be in danger of being subjected to torture," as
used in Article 3 of the Convention, to mean "if it is
more likely than not that he would be tortured."

136 Cong. Rec. S17486, S17491 to S17493 (Oct. 27, 1990).

The Senate's advice and consent was expressly subject to
this understanding, and to the declaration "[t]hat the provisions
of Articles 1 through 16 . . . are not self-executing."  136
Cong. Rec. S17486, S17491 to S 17492 (Oct. 27, 1990).  The
ratification instrument was deposited with the United Nations in
1994.  <u>See</u> 64 Fed. Reg. 8478, 8478 (Feb. 19, 1999).

In 1998, Congress enacted the Foreign Affairs Reform and
Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, 112
Stat. 2681, 2681-82 (Oct. 21, 1998), which required the Attorney
General to promulgate "regulations to implement the obligations

11

of the United States under Article 3 of the [CAT] subject to any
reservations, understandings, declarations, and provisos
contained in the . . . Senate resolution of ratification."  FARRA
§ 2242(b).  Accordingly, the Attorney General promulgated
regulations defining "torture" and providing, inter alia, torture
is an act which is "intentionally inflicted" on a person.   See
64 Fed. Reg. at 8489-91 (codified at 8 C.F.R. § 208.18(a)).  The
regulations also provided that "[i]n order to constitute torture,
an act must be specifically intended to inflict severe physical
or mental pain or suffering.  An act that results in
unanticipated or unintended severity of pain and suffering is not
torture."  64 Fed. Reg. at 8489-91 (codified at 8 C.F.R. §§
208.18(a)(5)); see also Wang v. Ashcroft, 320 F.3d 130, 134 (2d
Cir. 2003) ("an alien is not entitled to CAT relief unless he can
prove that . . . he is more likely than not to suffer
intentionally-inflicted cruel and inhuman treatment.") (emphasis
added); see e.g., Cano-Merida v. INS, 311 F.3d 960 (9th Cir.
2002); Sevoian v. Ashcroft, 290 F.3d 166, 175 (3d Cir. 2002);
Najjar v. Ashcroft, 257 F.3d 1262, 1303 (11th Cir. 2001); In re
J-E-, 23 I. & N. Dec. 291, 296 (BIA 2002) ("This specific intent
requirement is taken directly from the understanding contained in
the Senate's ratification resolution."); but see Zubeda v. INS,
333 F.3d 463, 473 (3rd. Cir. 2003) (intent requirement in CAT
does not require "specific intent").

## B.    Plenary Power Doctrine

Any review of an immigration statute must begin with the fundamental understanding that Congress is entitled to the utmost deference in immigration matters, its authority over this area being plenary and exclusive.  See Reno v. Flores, 507 U.S. 292, 305-06 (1993); Galvan v. Press, 347 U.S. 522, 531 (1954); Harisiades v. Shaughnessy, 342 U.S. 580, 588-89 (1952).  Such "[d]eference to the political branches dictates 'a narrow standard of review of decisions made by the Congress . . . in th[is] area.'"  Miller v. Albright, 118 S. Ct. 1428, 1437 n.11 (1998) (quoting Mathews v. Diaz, 426 U.S. 67, 82 (1976)); see id. at 1447 ("Judicial power over immigration and naturalization is extremely limited.") (Scalia, J., concurring) (collecting cases).

## C.    Habeas Review of CAT Claims

In Wang, the Second Circuit recently held that habeas review is available for criminal aliens who otherwise have no opportunity to seek review of a denial of CAT relief in the courts of appeals.  Wang, 320 F.3d at 141-42.  The Court, however, instructed that habeas review is limited to legal and constitutional challenges, including the erroneous interpretation and application of relevant statues.  Id. at 142-43.  The Court declined to decide the precise standard of review, but noted that habeas review is generally more limited than direct review.   Id. at 143.

13

## 1.  Standard of Review

### I.  <u>de</u> <u>novo</u> review with deference

It would appear that two distinct standards of review must apply in this case.  The BIA's interpretation of the Act and its elaboration of the burdens of proof required under the Act are matters of law and hence are reviewed <u>de novo</u> by this Court.  <u>See</u> <u>Zhang v. Slattery</u>, 55 F.3d 732, 744 (1995); <u>see also</u> <u>Velarde v. INS</u>, 140 F.3d 1305, 1309 (9th Cir. 1998); <u>Meguenine v. INS</u>, 139 F.3d 25, 27 (1st Cir. 1998).

Nevertheless, this Court's review of the BIA's construction of the Act is limited by "the substantial deference [it] owe[s] [to] administrative tribunals in their interpretations of statutory law." <u>Osorio v. INS</u>, 18 F.3d 1017, 1022 (2d Cir. 1994); <u>accord</u> <u>Meguenine</u>, 139 F.3d 25 (court must defer to BIA's interpretation of Act); <u>Rosendo-Ramirez v. INS</u>, 32 F.3d 1085, 1087 & n.2 (7th Cir. 1994) (same); <u>Urbina-Mauricio v. INS</u>, 989 F.2d 1085, 1087 (9th Cir. 1993) (same); <u>Silwany-Rodriguez v. INS</u>, 975 F.2d 1157, 1160 (5th Cir. 1992) (review of BIA's conclusions of law is limited).  Moreover, where a statute is ambiguous with respect to a specific issue, the Court's review of the agency's interpretation is limited to "whether the agency's answer is based on a permissible construction of the statute." <u>INS v. Aguirre-Aguirre</u>, 119 S. Ct. 1439, 1445 (1999) (citing <u>Chevron USA v. Natural Resources Defense Council</u>, 467

14

U.S. 837, 843 (1984)); <u>Ahmetovic v. INS</u>, 62 F.3d 48, 53 (2d Cir. 1995); <u>Zhang</u>, 55 F.3d at 749-50.

### b.  Substantial Evidence Standard

The BIA's factual determination that Guillaume failed to establish critical elements of his CAT claim should be reviewed under the substantial evidence test.

The Supreme Court has defined substantial evidence to mean "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 30 U.S. 197, 229 (1938)); <u>Melgar de Torres v. Reno</u>, 191 F.3d 307, 312-13 (2d. Cir. 1999).  The standard plainly requires "something less than the weight of the evidence." <u>Consolo v. Federal Maritime Comm'n</u>, 383 U.S. 607, 620 (1966).

Under this standard, the agency's decision "can be reversed only if the evidence presented by [the challenger] was such that a reasonable factfinder would have to conclude" contrary to the agency.  <u>INS v. Elias-Zacarias</u>, 502 U.S. 478, 481 (1992), <u>citing</u> <u>NLRB v. Columbian Enameling & Stamping Co.</u>, 306 U.S. 292, 300 (1939); <u>see also</u> INA § 242(b)(4)(B), 8 U.S.C. § 1252(b)(4)(B) (2000).  The Board's "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  INA § 242(b)(4)(B), 8 U.S.C.

§ 1252(b)(4)(B).

This is the "substantial evidence" standard which the Supreme Court has emphasized both in the specific context of immigration and in the wider context of general administrative law, and is a narrow and deferential standard of review. Elias-Zacarias, 502 U.S. at 481 n.1; NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939); see also Ali, 237 F.3d at 596 (substantial evidence standard applies to CAT claims because review is available only under 8 U.S.C. § 1252); Ontunez-Tursios v. Ashcroft, 303 F.3d 341, 353 (5th Cir. 2002) (regarding CAT claims, "[w]e apply the same standards of review applied to . . . asylum claims"); see generally 8 U.S.C. § 1252(b)(4)(B) (Supp. IV 1998) ("the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). Moreover, the agency is not required to articulate all of the facts which support its conclusion; rather, the agency's decision must be upheld if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Elias-Zacarias, 502 U.S. at 481.

The Second Circuit has recognized that the substantial evidence standard of review is "exceedingly narrow," Melgar de Torres, 191 F.3d at 313, and permits reversal only if the record evidence would have compelled a finding in the alien's favor.

See Elias-Zacarias, 502 U.S. at 481 & n.1.

Accordingly, under the substantial evidence standard, this Court's task is to determine whether the administrative record compelled a finding contrary to that of the IJ.  See e.g., Elias-Zacarias, 502 U.S. at 481 & n.1; Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (mere possibility of drawing two inconsistent conclusions from evidence "does not prevent an administrative agency's finding from being supported by substantial evidence").  A reviewing court "should not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence." Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992); see also Ash Grove Cement Co. v. FTC, 577 F.2d 1368, 1378 (9th Cir. 1978) ("Findings of fact cannot and will not be set aside if the evidence in the record reasonably supports the administrative conclusion, even though suggested alternative conclusions may be equally or even more reasonable and persuasive"); Klawitter v. INS, 970 F.2d 149, 151-52 (6th Cir. 1992) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573-75 (1985) (citations omitted)) ("Substantial evidence is thus a deferential standard which 'plainly does not entitle a reviewing court to reverse . . . simply because it is convinced that it would have decided the case differently.'"); see also United States v. International Bhd. of Teamsters, 170 F.3d 136, 143 (2d Cir. 1999).

17

### i.   This Court Cannot Consider
### Facts Outside the Administrative Record

Because this Court acts as a reviewing court that is tasked with determining whether the IJ's and BIA's factual findings are supported by substantial evidence, this Court cannot look outside of the factual record that has been developed during the administrative process.[5]

In addition, to the extent that petitioner failed to include any testimony or record evidence that was available during the administrative process, he has waived or alternatively, failed to exhaust with regard to those matters.  See Theoropoulos v. INS, ___ F.3d ___, 2004 WL 49119 (2d Cir. 2004) (administrative exhaustion requirement in INA applies to habeas corpus review); Custodio v INS, No. Civ.A.302CV155 (CFD), 2002 WL 1608329, at *3 (D. Conn. June 22, 2002) (claims raised for the first time on habeas review cannot be considered); Hylton v. INS, No. 01 Civ. 11849 (AKH), 2003 WL 1537385, at *4 (S.D.N.Y. Mar. 24, 2003)

_____

[5]   At oral argument, the Court expressed concerns about the state of the record and directed the parties to meet and confer to determine whether there were additional materials that would be helpful to the Court in reviewing this matter.  The parties have jointly provided the Court with a Joint Appendix which include additional material that may be responsive to some of the Court's concerns.  The Government maintains its objection – raised at oral argument - of the consideration of any factual material outside the administrative record because this Court's review is limited to the analysis of the decisions of the IJ and the BIA based on the record evidence.  However, it is the Government's position that even if considered, none of the additional documents contained in the joint appendix "compel" a contrary finding in this case.

18

(habeas petitioner failed to exhaust administrative remedies where he did not appeal IJ's denial of relief under CAT to BIA); <u>Merisier v. INS</u>, No. 00 Civ. 0393 (GBD) (AJP), 2000 WL 1281243, at *12 (S.D.N.Y. Sept. 12, 2000) ("[A]llegations raised for the first time in this habeas petition [regarding petitioner's CAT claim] cannot be considered because they were not raised before the INS.").

    D.   **Defining Torture**

The CAT defines "torture" as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining . . . information or a confession, punish[ment] . . . or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1) (2002).

There are five basic requirements for an act to constitute torture under the CAT. First, the act must be committed by the government or with government acquiescence. Second, the act must involve the infliction of severe pain and suffering. "'Torture is an extreme form of cruel and inhuman treatment,'" even cruel and inhuman behavior by officials may not warrant CAT protection. <u>Sevoian</u>, 290 F.3d at 175 (quoting 8

19

C.F.R. § 208.18(a)(2)).  Third, the infliction of the pain must be
for some illicit purpose which includes, punishing, intimidating,
or discriminating.  Fourth, it is required that the infliction of
pain be specifically intended.   "'In order to constitute torture,
an act must be specifically intended to inflict severe physical
or mental pain or suffering.'"  Wang, 2003 WL 255958, at *2
(quoting 8 C.F.R. § 208.18(a)(5)).  Fifth, the act cannot be
pursuant to a lawful sanction.

### 1. General Prison Conditions do not Constitute Torture under Customary International Law.

Amicus[6] essentially contend that U.S. law should be
interpreted consistent with customary international law which
would recognize the conditions in Haitian prisons to be
tantamount to torture.  See Brief of Amicus Curiae ("Am. Br.") at
11-15.  This claim is unavailing.  As an initial matter, to
compare any "international" definition of torture with that
interpretation of the term torture by the BIA ignores the
substantial deference owed to administrative agencies in the
interpretation of their statutes.  See supra at 13-17.  Moreover,
amicus have failed to establish that there exists an unambiguous
internationally recognized minimum standard for conditions in
prisons so as to define a violation under international customary

---

[6]    The Court sua sponte appointed Yale Law School's Human
Rights Clinic as amicus curiae in this matter.

law.

### a. Customary International Law

Recently, the Court of Appeals for the Second Circuit discussed at length the method for determining whether a principle can be considered to be customary international law. See <u>Flores v. Southern Peru Copper Corporation</u>, 343 F.3d 140 (2d Cir. 2003).  In its decision, the Second Circuit admonished that "in determining what offenses violate customary international law, courts must proceed with extraordinary care and restraint." <u>Flores</u>, 342 F.3d at 154.  That is because:

> Customary international law is discerned from myriad decisions made in numerous and varied international and domestic arenas.  Furthermore, the relevant evidence of customary international law is widely dispersed and generally unfamiliar to lawyers and judges.  These difficulties are compounded by the fact that customary international law -- as the term itself implies –- is created by the general customs and practices of nations and therefore does not stem from any single, definitive, readily-identifiable source.  All of these characteristics give the body of customary international law a 'soft, indeterminate character,' (citation omitted), <u>that is subject to creative interpretation</u>.

<u>Id.</u> (internal citations omitted) (emphasis added).

<u>Flores</u> discusses three specific requirements for a principle to be considered customary international law.  First, the principle must be a universally recognized norm.  <u>Id.</u> at 154. "[T]he principle must be more than merely professed or aspirational."  <u>Id.</u>  Second, countries must "accede to [the principle] out of a sense of legal obligation."  <u>Id.</u>  "Practices

adopted for moral or political reasons, but not out of a sense of legal obligation, do not give rise to rules of customary international law." Id. Third, the wrong must be "'of mutual, and not merely several, concern' to States." Id. at 155 (internal citations omitted); Id. (discussing the difference between concerns which are "mutual" and "several.").

In determining sources of international law, "we look primarily to the formal lawmaking and official actions of states and only secondarily to the works of scholars as evidence of the established practice of States." United States v. Yousef, 327 F.3d 56, 103 (2d Cir. 2003). Moreover, "we note that compilations and digests are of greater value in providing 'trustworthy evidence of what the law really is,' whereas expressly theoretical or normative works make their contribution by setting forth the 'speculations of. . . authors concerning what the law ought to be.'" Flores, 343 F.3d at 157, fn. 24.

Amicus have not set forth any settled rule or minimal standards that are universally recognized for individuals detained in prisons. Consequently, petitioner cannot establish a violation of international customary law. Not only is there no generally accepted standard for the treatment of individuals detained in prisons but it appears that while harsh treatment of prisoners –– even when used to elicit information –– could be considered ill-treatment, it does not rise to the level of

torture.  See Evelyn Mary Aswad, Note, Torture By Means of Rape,

84 Geo. L.J. 1913, 1921-23 (1996) (discussing the distinction

between ill-treatment and torture in international law).  In

fact, there are two factors that "appear to distinguish torture

from ill-treatment. . . First, torture inflicts greater pain than

does ill-treatment.  Second, torture has a deliberate or

purposeful element."  See Evelyn Mary Aswad, Note, Torture By

Means of Rape, 84 Geo. L.J. at 1921-23 (emphasis added).

In fact, the European Court has determined that punishment

such as "wallstanding, hooding, exposure to loud noise,

deprivation of sleep, and deprivation of food and drink" for the

purpose of eliciting information is not torture.  See Aswad at

fn. 72;[7] see Ireland v. United Kingdom, 1976 Y.B. Eur. Conv. On

H.R. 512 (Eur. Comm'n on H.R.) (England's use of five techniques

against Irish prisoners did not constitute torture).

Moreover, petitioner's reliance on reports from non-

governmental agencies about conditions in Haitian prisons is not

_____

[7]    Aswad at fn. 72 states in pertinent part:

"Wall-standing technique involved prisoners standing
'spreadeagled against the wall, with their fingers put high above
the head against the wall, the legs spread apart and the feet
back, causing them to stand on their toes with the weight of the
body mainly on the fingers.' (citation omitted).  In the hooding
technique, 'a black or navy coloured bag was put over the
witnesses' heads.' (citation omitted).  The noise technique
required that witnesses be 'held in a room where there was a
continuous loud and hissing noise' before their interrogations."
(citation omitted.).

unique to Haiti.  In fact, non-governmental agencies have determined that "deplorable daily living conditions [] are the plight of the great majority of the world's prisoners."  See Human Rights Watch World Reports, available at http//www.hrw.org/prisons.   The fact that prisons around the world are less than what they ought to be further supports the lack of a uniform norm adopted by the countries relating to conditions in prisons.

Moreover, amicus have not cited to any international convention, treaty, or covenant that the United States has ratified which sets forth a clear, unambiguous, minimal standard for conditions in prisons.  In addition, this record is devoid of any evidence that countries have reached a mutual understanding as to what constitutes minimally acceptable conditions in prison.

## 2.  **Torture Does Require Specific-Intent**

Even accepting arguendo the dubious assertion that the Attorney General's interpretation of the term torture as it is defined in Matter of J-E-, violates "customary international law," Am. Br. at 10, FARRA, the implementing regulations nevertheless are controlling.

Amicus's argument ignores the fact that the CAT is not self-executing.  See 136 Cong. Rec. at S17492 (declaration "[t]hat the provisions of Articles 1 through 16 . . . are not self-executing"); Senate Report at 12 ("not self-executing"

declaration in Senate resolution was "to clarify that the
provisions of the Convention would not of themselves become
effective as domestic law").  Accordingly, the legislation
enacting the CAT trumps any customary international law.  See
Bradvica v. INS, 128 F.3d 1009, 1014  n.5 (7th Cir. 1997)
("customary international law is not applicable in domestic
courts where there is a controlling legislative act"); Committee
of U.S. Citizens, 859 F.2d at 939 (statute supersedes customary
international law); FTC v. Compagnie de
Saint-Gobain-Pont-a-Mousson, 636 F.2d 1300, 1323 (D.C. Cir. 1980)
(courts "obligated to give effect to an unambiguous exercise by
Congress of its jurisdiction to prescribe even if such an
exercise would exceed the limitations imposed by international
law").

Accordingly, the fact that the drafters of the CAT or other
interpreting the CAT may have a different understanding of the
treaty does not, as amicus contend, render the regulations
invalid.

**a.  Torture Requires the Act to be specifically Intended**

In light of the deference that is accorded to the BIA's
interpretation, the question before this Court is whether the
specific-intent requirement enunciated in Matter of J-E- "is
based on a permissible construction of the statute."  INS v.
Aguirre-Aguirre, 119 S. Ct. 1439, 1445 (1999) (citing Chevron USA

25

v. Natural Resources Defense Council, 467 U.S. 837, 843 (1984))
Not only is the BIA's interpretation of the CAT a permissible
construction of the regulation, but in light of the fact that
Congress's intent is clear, it is the only permissible
interpretation.

Amicus appear to construct their argument utilizing a
criminal paradigm.  They appear to argue that it would be
improper to consider torture to require specific intent because
general intent crimes have been held to constitute torture.  See
Am. Br. at 12 (discussion rape is a general intent crime which
has been recognized to be torture).  This premise is flawed for
several reasons.  Most importantly, the CAT is a civil statute
and therefore applying criminal concepts of specific intent –
which primarily deal with mens rea issues and defenses available
in criminal law –- to determine what constitutes torture under
the CAT will create unnecessary analysis into a confusing area of
criminal common law and could potentially produce bizarre
results.[8]

Rather, the appropriate analysis begins with utilizing the
rules of statutory construction that the Supreme Court has

---

[8]     Prior to the enactment of the Model Penal Code, crimes
were generally classified as either general intent crimes or
specific intent crimes.  See United States v. Bailey, 444 U.S.
394, 403-04 (1980)(discussing the confusion and the ambiguity in
determining whether a crime was a general intent or specific
intent crime).

already determined apply in interpreting the INA statutes.  The
Court has admonished that the "ordinary and obvious meaning of
the phrase is not to be lightly discounted."  See INS v. Cardoza-
Fonseca, 480 U.S. at 431.  "With regard to this very statutory
scheme [INA], we have considered ourselves bound to assume that
the legislative purpose is expressed by the ordinary meaning of
the words used." quoting INS v. Phinpathya, 464 U.S. 183, 189
(1984) (internal quotations omitted).

     The Court need not examine the legislative history because
as discussed below the ordinary meaning of the term "specifically
intended" is clear.  However, the regulations implemented by the
Attorney General are entirely consistent with Congress'
reservations and understandings.  First, with regard to 8 C.F.R.
§ 208.18(a)(5), as noted above, the Senate's resolution of
ratification specifically provides that the CAT should only be
ratified with the understanding that, "in order to constitute
torture, an act must be specifically intended to inflict severe
physical or mental pain or suffering and that mental pain or
suffering refers to prolonged mental harm caused by or resulting
from: (1) the intentional infliction or threatened infliction of
severe physical pain or suffering."  36 Cong. Rec. S17491 to
S17429.  The implementing regulation, 8 C.F.R. § 208.18(a)(5) is
plainly consistent with the Senate's understanding.

     The Senate's resolution of ratification states that the CAT

may only be ratified if "torture" is understood to mean "death [or] severe physical pain or suffering." The Attorney General appropriately promulgated regulations reflecting the Senate's understanding in 8 C.F.R. § 208.08(a)(2).

The ordinary meaning of the words used in the regulation, however, make it clear that deliberate and exact action is required.[9]  Blacks Law Dictionary defines specifically as "[i]n a specific manner; explicitly, particularly, definitely." Black's Law Dictionary 1254 (5th ed. 1979).  Specific is defined as "[p]recisely formulated or restricted; definite; explicit; of an exact or particular nature." Id.  Intend means "[t]o design, resolve, propose.  To plan for and expect a certain result." Black's Law Dictionary 727 (5th ed. 1979). Using the ordinary meaning of these words, petitioner must show that the Government of Haiti precisely and deliberately designed a plan for the purpose of inflicting an extreme form of cruel and unusual harm on criminal deportees.  Petitioner simply cannot make such a showing.  That is because the record evidence indicates that the deplorable conditions in Haiti's prison were not created as part of a plan to torture criminal deportees.  Rather, these conditions are a by-product of Haiti's economy.

---

[9]    In fact, the Supreme Court in Cardoza-Fonseca recognized that legislative history is only examined when there is a "clearly expressed legislative intention" contrary to plain meaning of the language employed in the statute or regulation. See Cardoza-Fonseca, 480 U.S. at 432, n. 12.

In light of the ordinary meaning of the words used in the
regulation, the ratification history, and the BIA's
interpretation of the regulation, the interpretation advanced by
the Third Circuit in <u>Zubeda</u> is an anomaly and should not be
followed.  <u>Zubeda</u> expressly rejects the specific intent
requirement.  Relying on the section in the regulation that
states that "[a]n act that results in unanticipated or unintended
severity of pain and suffering is not torture," <u>Zubeda</u> holds that
"[t]he intent requirement therefore distinguishes between
suffering that is the accidental result of an intended act, and
suffering that is purposefully inflicted or the <u>foreseeable</u>
<u>consequence</u> of deliberate conduct."  <u>Zubeda</u>, 333 F.3d at 473
(emphasis added).  Such a liberal construction takes the ordinary
meaning of the words "specifically intended" out of their normal
or natural meaning in a manner that is strikingly contrary to the
ratification history and is separate and distinct from the plain
language of the regulation.  "Specifically intended" is far more
narrow and it is different from "foreseeable consequence."

In addition, <u>Zubeda's</u> contention that "requiring an alien to
establish the specific intent of his/her persecutors could
"impose insurmountable obstacles to affording the very
protections the community of nations sought to guarantee under
the Convention Against Torture" is an overbroad generalization
that is simply not correct.  <u>Zubeda</u>, 333 F.3d at 474.  Like

withholding of removal, CAT requires a more likely than not standard -- not beyond a reasonable doubt. Moreover, CAT relief has been granted in the United States without requiring aliens to produce direct evidence from their persecutors. CAT, unlike any other form of immigration relief, however, is meant to be narrow form of relief that is granted in exceptional cases and is not intended to be a form of relief that one can easily obtain. In fact, the statistics support that - unlike asylum or withholding - CAT is rarely granted.[10]

### E.    The Record Evidence Supported the Denial of CAT

As discussed above, the appropriate question is not whether the alien provided evidence to support his contention; rather, "[t]o reverse the BIA finding we must find that the evidence not only supports that conclusion, but compels it." Elias-Zacarias, 502 U.S. at 481 n.1. As an initial matter, there is no record evidence that establishes that Guillaume would be tortured by government officials if returned to Haiti. That is because petitioner has not shown that deplorable daily prison conditions are tantamount to torture.

The record evidence shows that Haiti is country plagued with extreme poverty and political instability. (JA 17-32). It

---

[10]    The statistics show that only 625 CAT cases were granted between March 19, 1999 and September 30, 2003. (JA 98-99). These were cases in which asylum was denied but CAT relief was granted. Id. In contrast, for the year 2002 alone there were 10,979 asylum cases granted. See JA 129.

remains one of the poorest countries in the world.  It is
therefore not surprising that the conditions in Haitian prisons
are substandard.  (JA 20).  The prisons are ill-equipped to
provide appropriate care and treatment for its prisoners.  (JA
20).  Prisoners continue to suffer from "lack of basic hygiene,
malnutrition, poor quality heath care, and, in some facilities,
24-hour confinement."  (Id.).  However, while very troubling, and
not condoned by our Government, this situation does not fall
within the purview of the CAT.  As the IJ properly determined,
the record evidence certainly does not establish that the
government of Haiti will imprison Guillaume with the purpose to
intentionally inflict torture on him for some illicit purpose.

     The 2001 and 2002 State Department country reports are
"[the] obvious [and best] source of information on general
conditions in the foreign country."  Zamora v. INS, 534 F.2d
1055, 1062 (2d Cir. 1976).  The 2001 country report which is part
of the record evidence was relied upon by the IJ and the BIA.

     The 2002 State Department country report on Haiti states
that Haiti has "limited the return of criminal deportees from the
United States to 600 per year, creating a large backlog of
Haitian criminals in the United States waiting to be deported."
(JA 20).  The report goes on to state that criminal deportees are
detained until a family member agrees to take custody of them
which usually takes "one to two months but has lasted as long as

four months in unusual instances." (Id.).   Based on the 2001
and 2002 Country Reports, criminal deportees are no longer
detained for an indefinite period of time as was previously the
case.  Much of the record evidence submitted by the petitioner
dates back to 2000 when Haiti's practice was to indefinitely
detain criminal deportees.  Even though petitioner claims not to
have any family or friends in Haiti, the IJ noted that the record
evidence indicates that there is some food provided to the
detainees.  (A 97).

There is no doubt that the conditions in the Haitian
prison systems are not equivalent to what Guillaume received
while he was in the United States.[11]  Guillaume's situation,
however, does not present a cognizable claim for relief under the
CAT.

Morever, Haiti has opened-up its prisons to the media and
the international community in the hopes of securing aid to
provide better services to its detained population.  See Matter
of J-E-, 23 I & N. Dec. at 30.  The record evidences that non-
governmental organizations are involved in helping the situation
in Haitian prisons.   (A 91-96).  This evidence not only further
supports Haiti's lack of specific intent to inflict harm on its

---

[11]    Interestingly, many of the non-governmental
organizations that petitioner relies on have also criticized the
daily living conditions of prisons in the United States.  See
e.g. http//www.hrw.org/prisons (discussing inter alia, rape in
U.S. prisons).

prisoners but to the contrary supports that Haiti is willing to expose its prisons in an effort to obtain help from the international community so that it can provide better care to its detained population.  See Matter of J-E-, 23 I. & N. Dec. 291 at 30 (discussing some efforts by international groups to improve prison conditions).  Under these circumstances, it would strain the language and spirit of the CAT to conclude that public officials in Haiti intentionally torture their citizens by not providing optimal care in their prison system and that therefore, anyone who is in a Haitian prison would be entitled to CAT relief.[12]

As sympathetic as Guillaume's situation may be, it does not present cognizable claim for relief under the CAT.

**F.    Lawful Sanction**

Finally, Haiti's policy of detaining criminal deportees is designed to be a form of preventive detention in order to prevent convicted felons from increasing the insecurity in a country that is already is unable to control its criminals.  The individuals

---

[12]     Not only would such a holding make any Haitian prisoner, not just a criminal deportee, entitled to CAT relief but presumably could invite suits under the Alien Tort Claims Act.  See generally, Flores, 343 F.3d 140.  Given how much of the world's population continues to be subject to deplorable daily prison conditions, a finding of torture in this context will also entitle any individual who had been or could be detained in a prison with abysmal conditions to file for relief in the United States.  As discussed at length above, the language of the CAT does not support such wide-spread generalized protection.

that the Haitian government is seeking to detain are those who our own Government was unable to control. They are convicted felons and therefore have already shown the propensity to commit crimes. They are being returned to a country that appears to be completely unable to protect its own law-abiding citizens from violence and criminal activity. Accordingly, this deterrent policy was "designed by the Haitian Ministry of Justice to protect the populace from criminal acts committed by Haitians who are forced to return to the country after having been convicted of crimes abroad." <u>Matter of J-E</u>, 23 I & N Dec. at 300. The BIA has further recognized that "Haiti has a legitimate national interest in protecting its citizens from increased criminal activity." 23 I & N at 300. More importantly, even though this policy meets the "lawful sanction" exception authorized in CAT, in this case, the policy is not being used to defeat any practice of torture.

Conclusion

Guillaume has not met any of the five basic requirements for an act to constitute torture under the CAT. Guillaume has not established that abysmal daily prison conditions constitute torture either under international customary law or in interpreting the CAT. Moreover, petitioner has not established that the Haitian government is imprisoning criminal detainees for the purpose of inflicting severe physical or mental pain or

34

suffering. Finally, Haiti's deterrent policy is a lawful sanction. However, in this case it is not being used to defeat torture. For the foregoing reasons, Respondents respectfully request that the Court dismiss the petition for writ of habeas corpus.

Dated:  New Haven, Connecticut
        February 10, 2004

                          Respectfully submitted,


                          KEVIN J. O'CONNOR
                          United States Attorney for the
                          District of Connecticut
                          Attorney for Respondent

          By: _____
                          LISA E. PERKINS
                          Assistant United States Attorney


          For: KRISHNA R. PATEL (CT-24433)
                Assistant United States Attorney
                157 Church Street -- 23rd Floor
                New Haven, Connecticut 06510
                Telephone:  (203) 821-3753

35

### CERTIFICATE OF SERVICE

This is to certify that the foregoing was mailed on this date to the following:

Mary J. Hahn
James J. Silk
Allard K. Lowenstein International
  Human Rights Clinic
Yale Law School
127 Wall Street
New Haven, CT  06511

Michael Boyle, Esq.
169 Montowese Avenue
North Haven, CT  06473


By: _____
    LISA E. PERKINS
    ASSISTANT UNITED STATES ATTORNEY

For: KRISHNA R. PATEL
     ASSISTANT UNITED STATES ATTORNEY

36