UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED

2004 FEB 11  A 8:40

DISTRICT COURT
HARTFORD CT

| Kerving's Guillaume,<br>    Petitioner<br>v.<br>John Ashcroft, Attorney General, U.S.<br>Immigration and Naturalization Service,<br>Steven J. Farquharson, District Director, and<br>Gary Cote, Officer in Charge,<br>    Respondents |
|---|

No. 3:02CV1276 (RNC)

February 10, 2004

## PETITIONER'S CLOSING BRIEF

### I. INTRODUCTION

Petitioner Kerving's Guillaume submits this closing brief to the Court to bring the factual record in the case up to date and to discuss the remaining legal issues in the case. In light of the magisterial brief submitted to the Court by *amicus curiae*, the Allard K. Lowenstein International Human Rights Clinic, our discussion of the legal issues will be brief.

The Court has jurisdiction in habeas to review the BIA's decision denying Mr. Guillaume relief from removal under Article 3 of the Convention Against Torture ("CAT" or "the Convention"). Mr. Guillaume applied for CAT relief because if removed to Haiti, he would be indefinitely imprisoned under conditions that constitute torture within the meaning of the Convention. Both the original evidence submitted to the immigration court and the Board of Immigration Appeals, and the updated, supplementary evidence which the parties have provided the Court make it clear that: conditions to which repatriated deportees are subjected in Haiti are extraordinarily brutal and life-threatening; that the

1

Haitian government is aware of these conditions and has failed to ameliorate them; and that the Haitian government intentionally detains the deportees in these conditions in order to deter them from committing crimes in Haiti.

Although the BIA recognized these facts in its decision in Mr. Guillaume's case and in *Matter of J-E-*, 23 I&N Dec. 291 (BIA 2002), its precedent decision on this subject, the Board held that Haiti's detention policy does not amount to torture because the Haitian government does not have a specific intent to deliberately inflict torture on the deportees, and because it is "a lawful enforcement sanction designed by the Haitian Ministry of Justice to protect the populace from criminal acts committed by Haitians who are forced to return to the country after having been convicted of crimes abroad." *J-E-*, 23 I&N Dec. at 300.

The BIA's erred in construing 8 C.F.R. § 208.18(a)(5) to require a specific intent to deliberately inflict torture. The text of the regulation, the corresponding Senate resolution of ratification, and the legislative history of the Convention all suggest that the appropriate standard of intent is that there be intentional conduct which will foreseeably result in torture being inflicted. The BIA also erred in considering the detention program to be a lawful sanction because the Haitian government imposed it to reduce crime in Haiti, a legitimate governmental goal. The BIA's reading of the lawful sanction regulation, 8 C.F.R. § 208.18(a)(3), fundamentally undermines the Convention by allowing a government to exempt torture undertaken in support of any valid goal. For a sanction to be lawful it must be consistent with local and international law and not inconsistent with the fundamental purpose of the Convention. Indefinite detention in brutal, life-threatening

conditions is not authorized by the domestic law of the United States or Haiti or by international law.

The Court should enjoin the respondents from removing Mr. Guillaume to Haiti and remand his case to the BIA with instructions to grant him deferral of removal under Article 3 of CAT.

## II. FACTS, PROCEDURAL HISTORY

### A. PROCEDURAL HISTORY

Petitioner Kerving's Guillaume is a native and citizen of Haiti who has lived in the United States for many years. On July 11, 2001 he was ordered removed to his native Haiti based on his conviction of an aggravated felony offense. Fearing that upon return to Haiti he would be indefinitely imprisoned under brutal and life-threatening conditions, he applied for relief from removal under the United Nations Convention Against Torture. An immigration judge denied his application and the Board of Immigration Appeals ("Board" or "BIA") affirmed the immigration judge's decision on April 11, 2002. The BIA's decision in this case followed its precedent decision made three weeks earlier, *Matter of J-E-*, 23 I&N Dec. 291 (BIA 2002), holding that "neither indefinite detention nor inhuman prison conditions in Haiti constitutes torture" because "there is no evidence that either of these actions by the Haitian government is done with the specific intent to inflict severe pain or suffering..." *In re: Keegan Kerving's Guillaume*, A42 502 471 – Hartford (BIA April 11, 2002).

In *J-E-*, the Board explained its rationale at length. The Board majority conceded that prison conditions in Haiti are "inexcusable" *J-E-* at 301, and that the Haitian government

3

"intentionally detain[s] criminal deportees knowing that the detention facilities are substandard," id., but held that Haiti's detention policy did not constitute torture under CAT because indefinite detention was a lawful sanction, "a warning and deterrent [to Haitians repatriated from the United States] not to commit crimes in Haiti," *J-E-* at 300, *quoting* Letter from William E. Dilday, Director of Office of Country Reports and Asylum Affairs, Bureau of Democracy, Human Rights and Labor, U.S. Department of State, to Immigration Judge (April 12, 2001), and because "there is no evidence that Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering." *J-E-* at 300. The Board suggested that "budgetary and management problems as well as the country's severe economic difficulties," *J-E-* at 301, were the primary causes of poor conditions, and that both torturous and nontorturous forms of mistreatment were inflicted on deportees in Haitian prisons, with nontorturous forms predominating. *J-E-* at 301-302.

Mr. Guillaume filed this petition on July 23, 2002 seeking CAT relief and an immediate bond hearing to review his mandatory detention under INA § 236(c). He withdrew his mandatory detention claim at oral argument in the light of the Supreme Court's decision in *Demore v. Kim*, 123 S. Ct. 1708 (2003).

At oral argument, the Court offered the parties the opportunity to update the record in the case, which had been presented to the immigration court in early 2001. The Joint Appendix prepared by the parties includes reports from the INS Resource Information Center,[1] U.S. Department of State,[2] United Nations Commission on Human Rights,[3] and

---

[1] INS Resource Information Center, *Haiti: Information on Conditions in Haitian Prisons and Treatment of Criminal Deportees – July 2001*, Joint Appendix at 1; *INS Resource Information Center, Haiti: Information on Conditions in Haitian Prisons and Treatment*

4

the Vera Institute of Justice,[4] the deposition of Wilner Timothee, a man born in the Bahamas to Haitian parents and deported to Haiti in December 2000,[5] and articles from Haitian,[6] British,[7] and Canadian[8] sources that detail the conditions in which deportees are held in Haitian prisons and the Haitian government's awareness of their plight. It appears that conditions today are similar to those existing when the BIA decided *Matter of J-E-*, and when Mr. Guillaume filed this action.

## B. CONDITIONS THAT MR. GUILLAUME WOULD CONFRONT IF REMOVED TO HAITI

As described in the materials in the Joint Appendix, the prisons where returning deportees are held are desperately overcrowded, chronically malnourished, and routinely subject to sickness, violence, and intimidation.

Prisoners in Haitian prisons are being housed at approximately three to four times international minimum density standards. Vera Institute, Joint Appendix at 211. According to an INS report, one to three dozen men are held in a ten-foot square cell. INS Report, February 2002, Joint Appendix at 13. Wilner Timothee reported that his cell,

---

*of Criminal Deportees (2nd Response) – February 2002* ("INS Report, February 2002"), Joint Appendix at 5.

[2] U.S. Department of State, *Haiti, Country Reports on Human Rights Practices – 2002*, Joint Appendix at 17.

[3] United Nations Commission on Human Rights, *Haiti: Report of the Independent Expert – 2001*, Joint Appendix at 33.

[4] Anne Fuller, *Prolonged Pretrial Detention in Haiti*, July 2002 ("Vera Institute"), Joint Appendix at 188.

[5] Video Deposition of Wilmer Timothee, November 2, 2001 ("Timothee Deposition"), Joint Appendix at 41.

[6] "Five Dead, Many Wounded and Burned Down Prison Cells," *Le Nouvelliste*, November 16-18 2001, Joint Appendix at 80.

[7] "Haiti's Desperate Deportees," BBC News, *Crossing Continents: Americas*, December 8, 2000, Joint Appendix at 87.

[8] Claude Adams, "Deported or Dumped," *Saturday Night Magazine* (*National Post*, Canada), 2001, Joint Appendix at 92.

approximately seven feet square, held up to twelve men, who had to alternate standing and sleeping in four-hour shifts because of the crowding. Timothee Deposition, Joint Appendix at 55, blocks 57-58. All types of prisoners are mixed together. Vera Institute, Joint Appendix at 211-212.

Food is inadequate or unavailable unless deportees have money to purchase it themselves. The Vera Institute reports typical caloric intake as 600 to 1,200 calories per day, compared with the 2,000 calories needed for a healthy diet. Vera Institute, Joint Appendix at 213. Only one meal a day is available. Id. at 213. Food and potable water must be purchased, and frequently make deportees violently ill. Timothee Deposition, Joint Appendix at 70, blocks 117-120, 59, blocks 74-76, and 61-62, blocks 84-86; INS Report, February 2002, Joint Appendix at 13-14; Vera Institute, Joint Appendix at 213.

Poor nutrition, overcrowding, lack of exercise and exposure to sun, and limited or no medical treatment lead to "a large number of incarcerated persons suffering from various infections, dermatitis, tuberculosis, and malnutrition." Vera Institute, Joint Appendix at 212. Sick prisoners are frequently not given medication and are left to fend for themselves. Timothee Deposition, Joint Appendix at 71, blocks 121-122.

According to the Vera Institute study, conditions in Haitian prisons "can only be expected to deteriorate further," despite some efforts to improve them, because the prison population continues to grow without facilities being expanded or resources increased. Vera Institute, Joint Appendix at 213 and 211.

Mr. Timothee describes violence against prisoners as commonplace. Guards beat prisoners in front of other prisoners until they bleed or pass out. Timothee Deposition, Joint Appendix at 55, block 59, at 68, blocks 109-110, and at 57, blocks 67-68. Police

who restored order after a November 2001 protest against prison conditions and a riot forced prisoners to lie on the ground and then stepped on them with their boots. INS Report, February 2002, Joint Appendix at 9-10. The same report describes retaliation against prison protesters at an earlier demonstration. Id. at 10.

Release from these conditions is dependent on payment of massive — at least $5,000 — bribes, Timothee Deposition, Joint Appendix at 62-63, blocks 88-92, having relatives in Haiti who are willing to come forward to guarantee a deportee's conduct by subjecting themselves to future arrest if the deportee commits crimes and evades police, INS Report, February 2002, Joint Appendix at 11, or luck. Timothee Deposition, Joint Appendix at 65-66, blocks 98-103.

As the BIA noted in *Matter of J-E*, Haitian officials are aware of these conditions and intend that the detentions serve a deterrent effect. "Prosecutor Augustus Brutus characterized these detentions as 'preventative measures' to keep returning 'bandits' from further contributing to the country's high levels of crime." INS Report, February 2002, Joint Appendix at 10, *quoting* U.S. Department of State, *Haiti, Country Reports on Human Rights Practices – 2000*. The same INS report quotes "Michael Lucius, the police official in charge of reviewing criminal deportees…

> "it may be illegal detention but what can we do? With all the instability and crime here we can't just turn these guys out on the streets with no visible means of support. It's not as if they are choirboys. We've got to protect our own population."

INS Report, February 2002, Joint Appendix at 10, *quoting* Lucy Ash, "Criminals, Go Home," *The Times* (London), Dec. 7, 2000. It also quotes a former Haitian Justice Minister's commentary on malnutrition in Haitian prisons:

> "Prison here is not sweet. We can only afford to feed our prisoners 1,300 calories per day, while someone needs 2,000 a day. When you get into jail here...you don't know how you're going to come out."

INS Report, February 2002, Joint Appendix at 10, *quoting* Yves Colon, "Haiti Opens Up to US Drug War," *Miami Herald*, Jan. 13, 2001.

### III. ARGUMENT

### A. THE COURT HAS HABEAS JURISDICTION TO REVIEW MR. GUILLAUME'S CLAIM. REVIEW IS DE NOVO.

"Federal courts have jurisdiction under § 2241 to consider claims arising under CAT, as implemented by FARRA and the regulations promulgated thereunder." *Wang v. Ashcroft*, 320 F.3d 130 (2d Cir. 2003). *See also Calcano-Martinez v. INS*, 232 F.3d 328, 342-3 (2d **Cir.** 2000), *aff'd,* 533 U.S. 348, 121 S. Ct. 2268 (2001) (maintaining habeas jurisdiction over final orders of removal).

Mr. Guillaume's case is fundamentally legal, challenging the BIA's application of essentially undisputed facts to the relevant law, and should be reviewed *de novo*. *Wang*, 320 F.3d at 143; *Diallo v. INS*, 232 F.3d 279, 287 (2d Cir. 2000).

In the two key questions at issue in this case, the Court should accord little deference to the BIA's construction of the CAT implementing regulations. Where the plain meaning of the regulations can be ascertained "by employing traditional tools of statutory construction, ...that is the end of the matter." *Bell v. Reno,* 218 F.3d at 86, 90 (2nd Cir. 2000) (internal citations and quotation marks omitted). Even where the Court finds a statute to be ambiguous, it must "then ask whether the agency's answer is based on a permissible construction of the statute." In such a case, the Court's review is "not merely for 'minimum rationality' but requires that the administrative agency 'articulate a logical

8

basis' for its judgment." *Detsel v. Sullivan*, 895 F.2d 58, 63 (2d Cir. 1990) (internal quotation marks omitted." *Iavorski v. INS*, 232 F.3d 124, 133 (2nd Cir. 2000).

As we discuss below, in its analysis in this case and in *Matter of J-E-*, the BIA failed to follow the plain meaning of the regulation when it grafted a specific intent requirement onto 8 C.F.R. § 208.18(a)(5). Similarly, its expansive construction of the lawful sanction exception to the Convention, 8 C.F.R. § 208.18(a)(3), is contrary to CAT's object and purpose. Based on their inconsistency with the purpose of CAT and the language of the regulations, neither of these positions merits the Court's deference.

**B. HAITI HAS IMPOSED ITS INDEFINITE DETENTION POLICY INTENTIONALLY. IMPOSITION OF TORTUOUS CONDITIONS ON DEPORTEES IS A FORESEEABLE RESULT OF THE POLICY. THIS COMBINATION OF INTENTION, CAUSE AND EFFECT — NOT SPECIFIC INTENT IN THE SENSE OF SPECIFICALLY DESIRING TO INFLICT PAIN ON A VICTIM – IS THE INTENT REQUIRED IN CAT'S DEFINITION OF TORTURE.**

8 C.F.R. § 208.18(a)(5) states that:

> In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture.

In construing the regulation to require that a government actor have a "specific intent to inflict severe physical or mental pain or suffering," *J-E-* at 300, for his or her conduct to be torturous, the BIA made a fundamental error of statutory construction, overriding the plain meaning of the paragraph. As the Third Circuit has noted, the two sentences, taken together, "simply exclude[] severe pain or suffering that is the unintended consequence of an intentional act..." *Zubeda v. Ashcroft*, 333 F.3d 463, 473 (3d Cir. 2003), "distinguish[ing] between suffering that is the accidental result of an intended act, and suffering that is purposefully inflicted or the foreseeable consequence of deliberate

9

conduct." The *Zubeda* Court concludes: "this is not the same as requiring a specific intent to inflict suffering." Id.

The Zubeda Court's interpretation is consistent — and the BIA's reading is inconsistent — with the overall purpose of the Convention to protect potential victims of torture and with the legislative history of the Convention, whose drafters specifically rejected a definition that required that torture be "deliberately and maliciously inflicted." Deborah Anker, *Law of Asylum in the United States* 465, 486 (3d ed. 1999), *citing* J. Hermann Burgers and Hans Danelius, *The Convention Against Torture: A Handbook on the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, at 41, and Rhonda Copelon, *Recognizing the Egregious in the Everyday: Domestic Violence as Torture*, 25 Colum. Hum. Rts. L. Rev. 291, 325 (1994).

It is also inconsistent with the Senate's Understanding of the term "acquiescence'" defined at 8 C.F.R. § 208.18(a)(7).[9] The Senate amended this Understanding to change the word "knowledge" which appeared in an earlier draft to "awareness" in order "to make it clearer that both actual knowledge and willful blindness fall within the meaning of acquiescence." Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Exec. Rep. 101-30 (1990) "Senate Report"), at 36.

The Board's requirement that victims or potential victims prove their torturer's specific intent would also make it extraordinarily difficult to ever prove up a claim. Although this case is unusual in that Haitian officials have frankly disclosed their intentions in imposing indefinite detention to intimidate returning deportees and deter

---

[9] "(7) Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity thereafter breach his or her legal responsibility to intervene to prevent such activity."

10

them from committing crimes in Haiti, in general, persecutors do not provide their victims with documentation discussing their motivation and the particular degree of suffering that they intend to inflict. *See Zubeda* at 474.

## C. TORTURE IS NEVER A LAWFUL SANCTION, EVEN IF IT IS INFLICTED TO FURTHER A LAUDABLE GOAL. NEITHER HAITIAN, AMERICAN, NOR INTERNATIONAL LAW SANCTION INDEFINITE ADMINISTRATIVE DETENTION.

The BIA's holding that Haiti's detention policy is a lawful sanction since the goal underlying it – "to protect the populace from criminal acts committed by" returning deportees – is a legitimate one is inconsistent with the purpose of the Convention, the implementing regulations, and the Senate Understandings. 8 C.F.R. § 208.18(a)(3), which defines the lawful sanction exception, specifically exempts from its scope "sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture."

The regulation does not make allowance for exceptions based on underlying positive motives or any other reason.[10] The Senate Report recognizes the potential slippery slope that would result if governments could create their own exceptions to the prohibition against torture by the building exemptions into their domestic law: "[I]t is imperative that other States Parties be prevented from using the 'lawful sanctions' exemption to justify actions which are clearly torture by declaring them lawful under domestic law." Senate

---

[10] Just as the Convention does not exempt torture imposed in furtherance of positive motives, it also does not exempt torture that might affect a potentially numerous group. The Convention's standards are consistent regardless of the number of applicants potentially affected. The government's position at oral argument that CAT applies to "one person out of the box" is valid in the sense that the standard is high and torture is uncommon. However, to the extent that "one person out of the box" suggests that there is a "floodgates" or numerical limitation on CAT relief, it is not consistent with the Convention.

Report at 6. Based on the Senate Understandings, sanctions are evaluated against American and international law. Id.

Haiti's detention policy appears to be inconsistent with its own Constitution, Article 24 of which allows individuals (except for criminals "caught in the act") to be detained only pursuant to a legal order, Haitian Constitution, Article 24, and which forbids "any psychological pressure or physical brutality" while in detention. Id., Article 25. Indefinite administrative detention also raises significant constitutional questions under American law. *See*, e.g., *Zadvydas v. Davis*, 533 U.S. 678, 121 S. Ct. 2491, 150 L. Ed. 2d 653, 2001 U.S. LEXIS 4912 (2001).

## IV. CONCLUSION

The Court should enjoin order the respondents from removing Mr. Guillaume to Haiti and remand his case to the BIA with instructions to grant him deferral of removal under Article 3 of CAT.

Respectfully submitted for Petitioner
Kerving's Guillaume by

*Michael J Boyle*

Michael Boyle,
federal bar ct13518; juris 408629
169 Montowese Avenue
P.O. Box 335
North Haven, CT 06473-0335
203 239-2299, fax 203 985-8207
mboyle@immigrantcenter.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed first class, postage prepaid, on February 10, 2004 to Mary J. Hahn, Yale Law School, Allard K. Lowenstein International Human Rights Clinic, P.O. Box 208215, New Haven, CT 06520-8215 and AUSA Krishna R. Patel, Office of the U.S. Attorney, 157 Church Street, 23rd floor, New Haven, CT 06510.

*Michael J Boyle*

Michael Boyle